# United States Court of Appeals
## For the First Circuit

No. 15-2460

MICHAEL MCCUE,

Plaintiff, Appellee,

v.

CITY OF BANGOR, MAINE; OFFICER KIM DONNELL; OFFICER WADE
BETTERS; OFFICER JOSHUA KUHN; OFFICER DAVID FARRAR; AND OFFICER
CHRIS BLANCHARD,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Frederick F. Costlow, with whom Heidi J. Hart, Frederick J.
Badger, and Richardson, Whitman, Large & Badger were on brief, for
appellants.
David J. Van Dyke, with whom Lynch & Van Dyke, P.A. was on
brief, for appellee.

September 26, 2016

**LYNCH**, **Circuit Judge**. Michael McCue, the father of Phillip McCue ("McCue") and the personal representative of McCue's estate, brought this 42 U.S.C. § 1983 action after McCue's tragic death resulting from his encounter with the five Bangor police officers named as defendants. On the night of their encounter, the officers sought to take McCue into protective custody due to his erratic behavior believed to be caused by ingestion of bath salts. In an attempt to restrain McCue, who initially resisted, the officers placed McCue in a face-down, prone position for a disputed period of minutes while two officers exerted weight on his back and shoulders. McCue was declared dead shortly after this intervention. An expert witness for the plaintiff attributed the likely cause of death to prolonged restraint in the prone position "under the weight of multiple officers, in the face of a hypermetabolic state of excited delirium."

The plaintiff brought suit against the City of Bangor and the five officers in their individual and official capacities. The plaintiff asserted violations of his son's federal constitutional rights, as well as various state law tort claims. The district court granted the defendants' summary judgment motion on the basis of qualified immunity on all claims, with two exceptions: it denied the five officers' claims of qualified immunity as to the alleged use of excessive force after McCue ceased resisting and also denied immunity under the Maine Tort

- 2 -

Claims Act ("MTCA"), Me. Stat. tit. 14, §§ 8101-8118, as to the assault and battery claim. The court denied summary judgment on these issues because it found, following a magistrate judge's recommendation, that there remained material disputed issues of fact as to these claims.

The defendants appeal, arguing that they are entitled to pretrial qualified immunity on these remaining claims of excessive force and assault and battery. The plaintiff counters that we do not have jurisdiction over the defendants' interlocutory appeal, as there are material factual issues in dispute about the time at which McCue ceased resisting and the degree of force the officers continued to use against him after that point. We agree with the plaintiff that we lack appellate jurisdiction over this interlocutory appeal under Johnson v. Jones, 515 U.S. 304 (1995). We dismiss the appeal.

I.

"We have jurisdiction over an interlocutory appeal of a denial of summary judgment on qualified immunity only insofar as the appeal rests on legal, rather than factual grounds." Cady v. Walsh, 753 F.3d 348, 350 (1st Cir. 2014) (citing Johnson, 515 U.S. at 313). We thus summarize the facts in the light most favorable to the nonmoving party, the plaintiff. The record also contains video footage of a portion of McCue's encounter with the defendants

through the "Car 22 video."[1]  As the Supreme Court has instructed us to independently watch and take into account such footage in assessing the credibility of each party's version of the facts, Scott v. Harris, 550 U.S. 372, 378, 380-81 (2007), we intersperse our observations of the footage where appropriate.

On September 12, 2012, McCue was in the common area of an apartment building located at 18 First Street in Bangor, Maine. Witnesses described him as "ranting and raving, yelling and screaming, and stomping and kicking at doors."  Fearing that the building manager, who had gone to investigate the situation, was in danger, a resident of the building called the Bangor Police Department.  Officer Kimberly Donnell responded to the call.  Upon her arrival, Donnell met with the caller, who led her to the second floor of the apartment building.  When Donnell reached the second floor, McCue "screamed something and then jumped over a banister in the third floor hallway and landed approximately eight feet below on the stairway that led to the second floor."  McCue then put his shoulder or elbow through the stairway wall and created a hole "a little larger than a softball."  He also threw a beer bottle in Donnell's direction and screamed an obscenity before running past Donnell and leaving the building.

---

[1]     There is a less helpful video from Car 15, which we have watched.  But it does not add any facts of note to those gleaned from the Car 22 video, as described later.

Donnell called for backup, and Officer Wade Betters responded to her request. The two followed McCue in a police car and attempted to speak to him upon making contact with him at a nearby fire station. McCue began pacing and continued yelling, so the officers issued a disorderly conduct warning, as well as a warning to stay out of the roadway. After asking Officer Ryan Jones (who is not a defendant in this suit) to monitor McCue, Donnell and Betters returned to 18 First Street to obtain more information. There, they learned that McCue was a bath salts user and that he might have used bath salts that evening. Upon leaving the building, the officers again encountered McCue, who had fled from Jones. McCue yelled, hurled profanities at Donnell and Betters, gestured to them, and challenged them to chase him.

Based on McCue's behavior and pursuant to the Bangor Police Department's policy, entitled "Response to Mental Illness and Involuntary Commitment," Betters decided that McCue should be taken into protective custody for a professional evaluation. Under the relevant policy, an officer is required to take an individual into protective custody when the "officer has reasonable grounds to believe that [the individual] seems mentally ill and presents a threat of immediate and substantial physical harm to himself or third persons." The policy defines "threat of imminent and substantial physical harm" to encompass a "reasonably foreseeable risk of harm to someone -- including the person experiencing a

- 5 -

mental health crisis -- of serious self-injury, violent behavior or placing others in reasonable fear of serious physical harm, and/or impairment to such an extent that a person is unable to avoid harm or protect themselves from harm." If an officer determines that an individual must be taken into protective custody, the officer must bring that person to a hospital for professional evaluation.

Officers Christopher Blanchard, David Farrar, and Joshua Kuhn, all defendants, heard Betters report that McCue should be taken into protective custody. Farrar and Kuhn located McCue running in the roadway. They left their cruiser to speak with him, but McCue "either responded unintelligibly or snarled at the officers" before running off again. In the process, McCue darted into the road, on Main Street, in front of Jones's vehicle. Betters and Kuhn, driving separate vehicles, unsuccessfully attempted to box McCue in and prevent him from running into traffic again. Farrar and Kuhn subsequently pursued McCue on foot and apprehended him when he tripped and fell on Main Street. McCue was on the ground on his stomach when Farrar and Kuhn reached him. A Bangor Fire Department fire engine pulled across Main Street and parked there to block off traffic. In the fire engine were three paramedics and one emergency medical technician. Other emergency personnel from the Bangor Fire Department were also standing nearby.

Kuhn initially placed his chest on McCue's shoulder and asked McCue to give up his hands, but McCue refused. Even after Kuhn placed his finger on a pressure point under McCue's nose to gain pain compliance and even after Farrar struck McCue a few times on his arms, McCue refused to comply and kept his hands underneath his body. McCue swore at the officers and threatened to kill them. Only after Donnell arrived on the scene and tased McCue did McCue give his hands up. That enabled the officers to handcuff his arms behind his back.

After securing McCue's arms, the officers turned their efforts toward securing his legs. By this point, both Blanchard and Betters had arrived on the scene. Donnell placed herself on McCue's legs because McCue continued to kick, resist, growl, swear, and make "unintelligible exclamations" at the officers. The Car 22 video from Blanchard's vehicle captures this behavior. The parties agree that the Car 22 video footage begins at some point after McCue was first held to the ground. Indeed, when Car 22 arrived on the scene, three officers were already attempting to restrain McCue, with Donnell already holding down his legs.

The Car 22 video, from 2:18 to 2:22, captures McCue kicking his legs, flailing his upper body, and shouting an expletive at the officers. After that point, between two and five officers continued to hold McCue down. Upon viewing the video, the magistrate judge observed that "[t]wo officers [Kuhn and

- 7 -

Farrar] applied what could be viewed as significant weight to Mr. McCue's shoulders and neck for a period of time, perhaps as much as four to five minutes, while other officers attempted to secure his feet." On our own viewing of the video, we agree with the magistrate judge's observation. Specifically, after McCue's outburst around 2:20, the Car 22 video depicts one officer placing his knee on McCue's neck while another sits on his back. The officer's knee remains on McCue's neck even after McCue twice shouts in distress that the officers are hurting his neck, from around 2:26 to 2:32 of the video. Around 2:47, McCue again shouts something unintelligible about his neck.

Following the 2:20 outburst, although McCue continues to growl and mutter intermittently until around 5:30 of the video, he does not seem to kick or flail as noticeably as he did at the 2:20 mark. It is difficult, if not impossible, to tell from the footage whether and how much McCue continued to resist, and how much pressure the officers exerted on his upper body.

As Blanchard attended to McCue's legs, his hand became trapped between McCue's ankles, and Blanchard sustained a serious hand injury. Blanchard rapidly punched McCue's leg ten times to free his hand. Blanchard and Donnell then successfully restrained McCue's ankles with flex cuffs, after which the officers tied together the ankle and wrist cuffs -- in a position known as a five-point restraint or "hog tie" -- using a dog leash retrieved

- 8 -

from a police vehicle. At some point after McCue's wrists and ankles were restrained but before he was placed in a five-point restraint, Blanchard punched McCue in his lower back, buttocks, or thigh region. It is undisputed that the officers placed McCue in the five-point restraint to "restrain and control him in order to transport him to the hospital for an evaluation." Between the time period when the officers secured the ankles (around 5:30 of the video) and when they completed the hog tie (around 7:05), at least two large officers continued to exert pressure on McCue's neck and upper body, sometimes kneeling and sitting on his back. By the time the officers lifted McCue from the ground, at 7:08, his body was limp and he "could have been unconscious."

At some point after lifting McCue off the ground and transporting him to a police vehicle a few yards away, the officers observed that McCue was unresponsive. One officer exclaims around 7:25 of the Car 22 video that McCue "might not be conscious right now." Seconds later, the Car 22 video captures an officer's statement that McCue is in a state of "excited delirium." Then, an officer comments that "the last thing we need is for him to die from excited delirium in the back of the car." Another video -- the Car 15 video, shot from Betters's vehicle -- was visually obstructed by the parked fire truck but clearly picked up the audio of the officers' conversation. It also confirms these statements regarding excited delirium.

- 9 -

During or immediately after making these statements, the officers called for medical assistance, and two firemen from the parked fire truck, as well as other emergency responders, arrived shortly thereafter. They were unable to resuscitate McCue. One of the plaintiff's expert witnesses attributed the likely cause of death to "prolonged prone restraint under the weight of multiple officers, in the face of a hypermetabolic state of excited delirium." The witness elaborated that "McCue's inability to hyperventilate and compensate for metabolic acidosis in his state of excited delirium led to his cardiopulmonary arrest."

Most of the officers were trained at the Maine Criminal Justice Academy, which provided limited information about the risk of positional asphyxia resulting from prone restraint. Officers were instructed that, after arrest, suspects should be placed in a seated position, not in a face-down position on their stomachs, in the police vehicle. Blanchard, who was trained at the police academy in Vermont and also received military police training with the United States Army, had been taught that a suspect who has been in a five-point restraint for an extended period of time should be monitored for signs of asphyxia. No officer was advised against placing weight on the upper back or shoulders of a prone suspect.

II.

On July 15, 2014, the plaintiff filed his First Amended Complaint in the District of Maine and named as defendants the City of Bangor and the five officers in their individual and official capacities. The complaint raised claims under § 1983 that the defendants had lacked probable cause to seize McCue, that they had used excessive force against McCue throughout their encounter, and that they had been deliberately indifferent to McCue's medical needs. The complaint also alleged various state law tort claims: assault and battery, wrongful death, negligent or intentional infliction of emotional distress, and respondeat superior and vicarious liability. The defendants moved for summary judgment on the basis of qualified immunity for the § 1983 claims and immunity under the MTCA for the corresponding state law claims.

On September 22, 2015, the magistrate judge issued a Recommended Decision granting in part and denying in part the defendants' motion. The recommendation concluded that the entire § 1983 claim against the City of Bangor should be adjudicated in the City's favor. As for the individual defendants, the magistrate judge recommended granting summary judgment in their favor on the § 1983 claims based on probable cause and deliberate indifference toward McCue's medical needs. The magistrate judge also recommended summary judgment in favor of the individual defendants with regard to the § 1983 claim alleging excessive force, except

- 11 -

as to the claim that the officers used excessive force after McCue had ceased resisting. Correspondingly, the magistrate judge recommended judgment in favor of the individual defendants on the state law assault claim, except as to the claim that the officers used excessive force after McCue had ceased resisting.[2]

As to excessive force, the magistrate judge found that there existed a "genuine issue of material fact as to whether Defendants used excessive force after Mr. McCue ceased resisting." McCue, 2015 WL 6848539, at *13. The magistrate judge emphasized that, "'[t]aken in the light most favorable to the party asserting injury,' the record could support a finding that Defendants continued to employ significant force after Mr. McCue ceased resisting and no longer posed a threat to the officers or himself." Id. at *9 (alteration in original) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009)). Furthermore, the magistrate judge found that these disputed facts were material because, "[a]t the time of Mr. McCue's apprehension, the law was clearly established that use of a significant level of force after a subject has ceased

---

[2] The magistrate judge specified that the Recommended Decision did "not address any other possible bases for summary judgment on the state law tort claims . . . or whether Plaintiff can proceed on an independent claim for emotional distress damages in this action." McCue v. City of Bangor, No. 1:14-cv-00098-GZS, 2015 WL 6848539, at *13 n.27 (D. Me. Sept. 22, 2015).

resisting violates the Fourth Amendment." Id. at *10 (citing, inter alia, Jennings v. Jones, 499 F.3d 2, 20–21 (1st Cir. 2007)).

After reviewing de novo all of the magistrate judge's determinations, the district court adopted the Recommended Decision in full. This appeal followed. The only issue before us is the pretrial denial of qualified immunity as to the plaintiff's allegation that the officers used excessive force after McCue had ceased resisting, as well as the corresponding denial of immunity under the MTCA for the state law assault claim.

III.

A. Federal Claim and Appellate Jurisdiction

We generally hear appeals only from final orders and decisions. See Cady, 753 F.3d at 358. "An order denying a motion for summary judgment is generally not a final decision within the meaning of § 1291 and is thus generally not immediately appealable." Plumhoff v. Rickard, 134 S. Ct. 2012, 2018 (2014). But that rule does not apply in certain instances where "the summary judgment motion is based on a claim of qualified immunity." Id. at 2019. Because qualified immunity is "an immunity from suit rather than a mere defense to liability," id. (quoting Pearson, 555 U.S. at 231), "pretrial orders denying qualified immunity generally fall within the collateral order doctrine," id. A pretrial denial of qualified immunity may be immediately appealable in some instances. Cady, 753 F.3d at 358.

- 13 -

In _Johnson_, the Supreme Court limited the circumstances in which we can hear such interlocutory appeals to those in which all "material facts are taken as undisputed and the issue on appeal is one of law." _Mlodzinski_ v. _Lewis_, 648 F.3d 24, 27 (1st Cir. 2011). Accordingly, a "district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact." _Cady_, 753 F.3d at 359 (quoting _Stella_ v. _Kelley_, 63 F.3d 71, 74 (1st Cir. 1995)); _see also_ _Stella_, 63 F.3d at 74 ("[A] summary judgment order which determines that the pretrial record sets forth a genuine issue of fact, as distinguished from an order that determines whether certain given facts demonstrate, under clearly established law, a violation of some federally protected right, is not reviewable on demand.").

_Johnson_ and its progeny foreclose assertion of appellate jurisdiction over the defendants' interlocutory appeal. The magistrate judge's opinion, fully affirmed by the district court, denied summary judgment precisely "[b]ecause the record includes factual disputes regarding Plaintiff's claim that Defendants used excessive force after Mr. McCue allegedly ceased resisting." _McCue_, 2015 WL 6848539, at *11. In particular, the record contains facts that, when viewed most favorably to the plaintiff, could support a finding that McCue stopped resisting at some point during

- 14 -

his encounter with the officers, and that the officers should have realized that he had stopped resisting, but that the officers "continued to exert significant force . . . no longer necessary to subdue Mr. McCue or to reduce the threat that he posed to himself or others." Id. at *10. And they continued to use such force after McCue told them that they were hurting his neck. In light of these remaining factual issues, we cannot assume jurisdiction over the defendants' interlocutory appeal.

Maintaining that they do not dispute the facts for the purposes of their appeal, the defendants argue that we have appellate jurisdiction notwithstanding the district court's identification of material factual disputes. They repeatedly assert that they construe the facts in the light most favorable to the plaintiff and that even so construed, "the videotape evidence conclusively establishes that there is at most a timeframe of 66 seconds for which the trial court could have concluded that Mr. McCue may have stopped resisting arrest and the Defendants may have continued to apply force." They further argue that "this momentary continuance of force" for up to 66 seconds did not violate McCue's Fourth Amendment right to be free from unreasonable seizure. Plaintiff disagrees and says that the record supports a finding that 4 minutes and 25 seconds is the true period involved.

As a matter of law, our circuit has assumed interlocutory appellate jurisdiction where the defendant "accepted as true all

facts and inferences proffered by plaintiffs, and [where] defendants argue[d] that even on plaintiffs' best case, they [we]re entitled to immunity." Mlodzinski, 648 F.3d at 28. Even "a defendant who concedes arguendo the facts found to be disputed is not barred by Johnson from taking an interlocutory appeal on a legal claim that the defendant is nevertheless entitled to qualified immunity on facts not controverted." Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998); accord Behrens v. Pelletier, 516 U.S. 299, 313 (1996).

But this avenue is not available to the defendants here because, contrary to their protests, they have not in fact accepted the version of the facts most favorable to the plaintiff. In at least four different places in their brief, the defendants stress that, construing the Car 22 video in the most plaintiff-favorable light, there was at most 66 seconds in which they might have continued to apply force after McCue had stopped resisting. The defendants appear to have arrived at this number by misconstruing a statement of fact by the magistrate judge. Explaining why Blanchard punched McCue's lower back, buttocks, or thigh region after the officers had secured both his wrists and ankles, the magistrate judge observed that Blanchard might have done so because McCue "squeezed" Blanchard's injured hand "extremely hard" or, alternatively, in order to "facilitate bringing together Mr. McCue's ankles and wrists to complete the five-point restraint."

- 16 -

McCue, 2015 WL 6848539, at *4.  The defendants inaccurately characterize this observation, asserting that the magistrate judge found that Blanchard could have punched McCue because "McCue was resisting the Defendants' efforts to put him in a five-point restraint."  Pinpointing this moment when Blanchard punched McCue as the last moment in which the magistrate judge found that McCue had resisted, the defendants count 66 seconds from that point to the point when McCue is lifted off the ground.

This insistence on 66 seconds both mischaracterizes the magistrate judge's statements about the facts and fails to present those facts in the light most favorable to the plaintiff.  First, neither reason that the magistrate judge cited to account for Blanchard's punch (to prevent McCue from squeezing his hand or to facilitate the five-point restraint) necessarily equates to resistance by McCue.  At this point, McCue's wrists and ankles had already been cuffed, thus minimizing his range of movements and the danger that he posed to his own and others' safety.  Simply put, there is no indication in the Recommended Decision that the hand squeeze should be construed as continued resistance, much less resistance justifying the force used.  The defendants' inference as such, of course, also demonstrates their failure to accept the version of facts most favorable to the plaintiff.

Second, our independent assessment of the Car 22 video, construed in the light most favorable to the plaintiff, discredits

- 17 -

the defendants' 66-seconds theory. See Scott, 550 U.S. at 380-81 (using video evidence to discredit plaintiff's version of facts and to hold that factual dispute was not "genuine"). The video, from 2:18 to 2:22, captures McCue resisting detainment by kicking his legs, thrashing his torso, and shouting an expletive at the officers. In contrast, from 2:22 until the officers lift him off the ground at 7:08, McCue periodically growls and makes other noises but does not kick or thrash his body again. He also complains that the officers are hurting his neck, but we cannot ascertain from the video if the officers adjusted their positions in response. Viewed in the light most favorable to the plaintiff, McCue's noises and slight movements after the 2:22 mark -- and even his squeezing of Blanchard's hand -- "may not constitute resistance at all, but rather a futile attempt to breathe while suffering from physiological distress." Abdullahi v. City of Madison, 423 F.3d 763, 771 (7th Cir. 2005). In short, McCue's movements after 2:22 of the Car 22 video are not dispositive of whether he continued resisting. And from this perspective, there could be close to five minutes -- not 66 seconds -- during which the officers continued to exert force on a nonresisting McCue. Because the defendants have not, in fact, accepted the plaintiff's best version of the facts, we hold that there remains a genuine dispute of fact that precludes appellate jurisdiction over the denial of summary judgment.

Finally, this factual dispute is material to the question on the merits. Depending on the amount of time for which the officers exerted force on McCue after he had ceased resisting, a jury could find that the officers' actions were unconstitutional under law that was clearly established in September 2012, the month of McCue's fatal encounter with the officers. The defendants argue that they should win because there was no clearly established law on this point. They are wrong.

We "adhere[] to a two-step approach to determine whether a defendant is entitled to qualified immunity." Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016). First, we ask whether the facts as alleged by the plaintiff make out a violation of a constitutional right. If so, we next ask whether that right was "clearly established" at the time of the alleged violation. Id. In determining whether the law was clearly established, we "ask 'whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right,' and then consider 'whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right.'" Id. at 39 (quoting Mlodzinski, 648 F.3d at 32–33). Here, we focus on the "clearly established" prong of the qualified immunity analysis.

This circuit has recognized that a "First Circuit case presenting the same set of facts" is not necessary to hold that defendants "had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive." Mlodzinski, 648 F.3d at 38; see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). We have also looked to the case law of sister circuits in determining whether a right was clearly established. See, e.g., Maldonado v. Fontanes, 568 F.3d 263, 271 (1st Cir. 2009) ("We reject the [defendant's] argument that this law was not clearly established because this court had not earlier addressed the questions of effects and seizure. Against the widespread acceptance of these points in the federal circuit courts, the [defendant's] argument fails."); see also Stamps, 813 F.3d at 41 (consulting "long-standing precedent from other circuits" to hold that defendant's alleged conduct violated clearly established Fourth Amendment law).

Even without particular Supreme Court and First Circuit cases directly on point, it was clearly established in September 2012 that exerting significant, continued force on a person's back "while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir. 2008) (quoting Champion

- 20 -

v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004)).
At least four circuits had announced this constitutional rule
before the events in question here.

For instance, the Tenth Circuit held in 2008 that an
officer was not entitled to qualified immunity at the summary
judgment stage where he had applied pressure to a detainee's back
for "about three minutes" after the detainee's hands and feet had
been restrained and another officer was "lying across his legs."
Id. at 1152; see also id. at 1155 ("[T]he law was clearly
established that applying pressure to [a person's] upper back,
once he was handcuffed and his legs restrained, was
constitutionally unreasonable due to the significant risk of
positional asphyxiation associated with such actions.").

In 2005, the Seventh Circuit similarly found that it
would be improper to grant qualified immunity at summary judgment
where an officer, for 30 to 45 seconds, had "placed his right knee
and shin on the back of [a person's] shoulder area and applied his
weight to keep [the person] from squirming or flailing."
Abdullahi, 423 F.3d at 765. Despite recognizing that the detainee
had "arch[ed] his back upwards as if he were trying to escape,"
id., the Seventh Circuit observed that this movement may not have

- 21 -

constituted resistance but rather "a futile attempt to breathe" with the officer's weight on his upper body, id. at 771.[3]

In a third case, in 2003, the Ninth Circuit found that two officers' pressing their weight against the torso and neck of a mentally ill person -- "after he was 'knock[ed] . . . to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach'" -- violated his Fourth Amendment right to be free from excessive force. Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1057 (9th Cir. 2003) (alterations in original).[4] Finally, in Champion, the Sixth Circuit observed in 2004 that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the

---

[3] The defendants rely on another Seventh Circuit case, Estate of Phillips v. City of Milwaukee, 123 F.3d 586 (7th Cir. 1997), but it is not nearly as helpful to the defendants as they claim. There, the Seventh Circuit determined that the defendant officers acted reasonably when they left a person in a prone position for a "few minutes" with his hands and legs restrained. Id. at 593. The facts in Estate of Phillips are distinct from those before us, as the deceased in that case was never hog-tied and never had two officers pressing down on his upper body.

[4] See also Tucker v. Las Vegas Metro. Police Dep't, 470 F. App'x 627, 629 (9th Cir. 2012) (unpublished opinion) (citing Drummond to deny two officers' motion for pretrial qualified immunity because "[a] jury could . . . reasonably conclude that the officers used excessive force in tasing [the detainee] and applying their body pressure to restrain him after he was handcuffed and face down on a bed"). Although Tucker is an unpublished opinion without precedential value, it serves as an example of the application of Drummond to deny qualified immunity.

back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force."  380 F.3d at 903.

We acknowledge the magistrate judge's finding that the defendants received limited training on the risk of asphyxia connected to prone restraint.  We also note, however, that the officers' repeated references to excited delirium, as captured in the Car 22 and 15 videos, suggest their knowledge of that condition and the associated risks.  Further, as the abundant case law demonstrates, a jury could find that a reasonable officer would know or should have known about the dangers of exerting significant pressure on the back of a prone person, regardless of any lack of formal training.  In sum, the disputed factual issue -- when McCue ceased resisting and for how long after that moment the officers continued to apply force on his back -- is material to the question of whether qualified immunity is proper.

B.  State Law Claim

For the same reasons, granting immunity under the MTCA for the corresponding state law assault and battery claim is improper at the summary judgment stage.  See Richards v. Town of Eliot, 2001 ME 132, ¶ 31, 780 A.2d 281, 292 ("The analysis of the state law claims of illegal arrest and excessive force is the same as for the federal law claims.").

IV.

In light of the material disputed facts yet to be resolved, we lack appellate jurisdiction to entertain the defendants' interlocutory appeal at this stage.

The appeal is <u>dismissed</u>.