STATE OF MAINE
YORK, ss.

SUPERIOR COURT
Civil Action
Docket No. CV-16-0174

DAVID A. SHULENBURG

Plaintiff,

v.

DAVID W. JAMIESON and
DARRELL P. EATON,

Defendants.

**MEMORANDUM OF DECISION
AND ORDER ON MOTION FOR
SUMMARY JUDGMENT**

David A. Shulenburg filed a two-count complaint seeking compensatory and punitive damages from David W. Jamieson and Darrell P. Eaton, officers of the Kennebunk Police Department, based on an incident that occurred on September 29, 2014. The complaint alleges that the officers used excessive force in restraining him for transport to the hospital (count 1) and that their actions constituted a violation of the Maine Civil Rights Act, 5 M.R.S. § 4682(1-A), because they lacked authority to take him into protective custody under 34-B M.R.S. §§ 3801 *et seq.* and acted maliciously in so doing (count 2).

Defendants have moved for summary judgment on both counts. For the reasons set out below, the motion is granted with respect to count 2 and denied with respect to count 1.

### I. Summary Judgment Factual Record

On September 29, 2014, Officer Jamieson and Sergeant Eaton arrived at Shulenburg's residence in response to a phone call from his estranged wife, Jean Gabriel (formerly Shulenburg). (D.S.M.F. ¶¶ 1, 6, 9.) Although Gabriel had already filed for

1

divorce from Shulenburg and was living in a different residence, she continued to work in Shulenburg's business. (D.S.M.F. ¶ 4.)

On the morning of the day in question, Gabriel received a call from Shulenburg explaining that he would be delayed coming to the office because he was going to be at home "composing a letter to her attorney regarding their divorce proceeding." (D.S.M.F. ¶ 6.) Sometime around 4 pm, Shulenburg called again to inform Gabriel that he had been knocked out after having tripped over something in his basement, hitting his head on the floor. (D.S.M.F. ¶ 9.) Gabriel called Sanford Regional Dispatch for medical assistance at approximately 4:30 pm, explaining what had happened and expressing concern for Shulenburg's health. (D.S.M.F. ¶¶ 10-13.) She also noted in the call that "[h]e didn't sound right to me. There was something – it just didn't sound right . . . . He didn't sound like himself." (D.S.M.F. ¶ 14.) Noting that Shulenburg sounded "somewhat combative, not combative but very angry," Gabriel requested to have police respond to the scene as well. (D.S.M.F. ¶ 16.) Gabriel then locked up the office and drove to the house to see if Shulenburg was alright. (D.S.M.F. ¶ 18.) She arrived at the residence at approximately 4:45 pm. (D.S.M.F. ¶ 19.)

Officer Jamieson was the first to respond at Shulenburg's residence. (D.S.M.F. ¶ 20.) Jamieson rang the doorbell and knocked on the door, but no one answered. (D.S.M.F. ¶ 20.) Jamieson then walked toward the back of the house, where he heard a male voice coming through the open garage door. (D.S.M.F. ¶ 20.) Jamieson recognized Shulenburg and asked if he could help. (D.S.M.F. ¶ 20.) Jamieson observed a cut on Shulenburg's nose and swelling on his forehead above his right eye. (D.S.M.F. ¶ 21.) Additionally, Shulenburg's pants and shirt were stained and he appeared unsteady on his feet. (D.S.M.F. ¶ 21.)

2

Shulenburg told Jamieson that he had fallen earlier in the day and struck his head on the concrete floor of his basement. (D.S.M.F. ¶ 23.) He also stated that he was unconscious for approximately three hours. (D.S.M.F. ¶ 23.) During this conversation, Jamieson noticed the smell of alcohol on Shulenburg's breath. (D.S.M.F. ¶ 24.) Jamieson told Shulenburg that a rescue unit was on the way to evaluate him for possible serious injuries. (D.S.M.F. ¶ 26.) Shulenburg responded that he was fine and didn't need any medical attention. (D.S.M.F. ¶ 26.)

When Gabriel arrived, she found Shulenburg sitting in a lawn chair and told him that she was the one who had contacted the police because she was worried about the fall. (D.S.M.F. ¶ 27.) Gabriel also saw dried blood on Shulenburg's face from his right temple down to the right jaw line. (D.S.M.F. ¶ 27.) Gabriel noticed that Shulenburg's speech pattern indicated that he was likely intoxicated, and that may have been the reason for his fall. (D.S.M.F. ¶¶ 31-32.) Shulenburg denied drinking, but Gabriel responded, "That doesn't mean a thing to me . . . . If you live with an alcoholic that's what you expect to hear." (D.S.M.F. ¶ 33.) After observing Shulenburg's condition, Gabriel encouraged him to go to the hospital. (D.S.M.F. ¶ 30.)

Because Kennebunk Rescue was busy with other calls, Arundel Rescue responded to the scene at 4:50 pm. (D.S.M.F. ¶ 37.) Paramedic Nicholas Pelletier began asking Shulenburg questions about his medical condition. (D.S.M.F. ¶ 39.) Shulenburg told Pelletier that he had tripped on a carpet in the basement and hit his head on the concrete. (D.S.M.F. ¶ 40.) Shulenburg also told Pelletier that he had taken some prescribed medication, including an "unknown amount" of Tramadol and Valium at some point during the day. (D.S.M.F. ¶ 41.) Shulenburg had also taken prescribed Xanax before the fall but failed to disclose this. (D.S.M.F. ¶ 46.) Shulenburg told rescue personnel that he was unsure how long he had been unconscious and that he had not

3

slept in approximately three days. (D.S.M.F. ¶ 49.) Pelletier observed an odor of alcohol on Shulenburg's breath and Shulenburg admitted to drinking the night before. (D.S.M.F. ¶ 50.) Pelletier thought that Shulenburg was still intoxicated at the time of evaluation. (D.S.M.F. ¶ 52.)

Pelletier described Shulenburg as "uncooperative, refusing treatment and not answering questions appropriately [by] continuously digressing from questioning about his medical condition to talk about his divorce and lawyers." (D.S.M.F. ¶ 53.) Pelletier noted that Shulenburg was, "alert, refusing to answer orienting questions, . . . speech is slurred, sensory motor delayed, does not obey commands, gait is unsteady . . . minor abrasion on nose . . . . The rest of physical exam was not completed due to patient un-cooperation and refusing treatment." (D.S.M.F. ¶ 54.) As a result, Pelletier was unable to complete routine assessments that he would typically perform. (D.S.M.F. ¶ 56.) Nonetheless, Pelletier believed that Shulenburg may have suffered a closed head injury, which could have caused an altered mental state. (D.S.M.F. ¶ 71.)

Based on his evaluation, Pelletier advised Shulenburg to go to the emergency room to be evaluated by a physician for a potential head injury. (D.S.M.F. ¶ 68.) Pelletier told Shulenburg that he was risking potential death if he did not go to the emergency room. (D.S.M.F. ¶ 72.) Shulenburg again would not agree to go to the hospital. (D.S.M.F. ¶ 73.)

Pursuant to the Medical Direction and Practice Board protocol ("MDBP protocol"), Pelletier called Medical Control at Southern Maine Health Center ("SMHC") because he believed that Shulenburg may have a serious head injury. (D.S.M.F. ¶ 74.) Pelletier explained Shulenburg's condition to emergency room physician Dr. Douglas Nilson. (D.S.M.F. ¶ 75.) Upon learning of plaintiff's condition, Dr. Nilson ordered Pelletier to

4

transport him to the hospital, either voluntarily or in protective custody. (D.S.M.F. ¶¶ 76-77.)

Pelletier informed Shulenburg that a doctor had ordered that he be transported to the emergency room, but Shulenburg again refused to go to the hospital willingly. (D.S.M.F. ¶ 78.) Under Emergency Medical Services protocol ("EMS protocol"), paramedics are encouraged to ask for law enforcement aid to carry out the order from Medical Control. (D.S.M.F. ¶ 79.) Pelletier informed Jamieson and Sergeant Eaton of Dr. Nilson's directive, at which point they also began trying to convince Shulenburg to go to the hospital willingly. (D.S.M.F. ¶¶ 80-96.)

During this process, Eaton called Shulenburg's primary physician, Dr. Michael Major. (D.S.M.F. ¶ 83.) Although Dr. Major apparently was aware of Shulenburg's fall from an earlier conversation with him that day, Shulenburg told him that he was taking a nap on his floor and had not told him of medication or alcohol use. (D.S.M.F. ¶¶ 84-85.) Dr. Major assumed that Shulenburg had been drinking that day. (D.S.M.F. ¶ 87.) During their earlier conversation, Dr. Major had recommended that Shulenburg go to the emergency room but told him that he (Dr. Major) thought he was still able to make his own transport decisions. (D.S.M.F. ¶¶ 88, 91-92.)

Eaton told Dr. Major that SMHC Medical Control advised that Shulenburg needed to be seen at the hospital. (D.S.M.F. ¶ 94.) Dr. Major agreed that Shulenburg needed to be transported (D.S.M.F. ¶ 95.), but also continued to maintain that Shulenburg was "competent to make his own decisions." (P.S.M.F ¶ 1.) Officer Jamieson tried again to convince Shulenburg to go to the hospital voluntarily; Shulenburg refused, stating that they were "going to fight." (D.S.M.F. ¶ 106.) Jamieson responded that he did not want to fight, let alone force Shulenburg to go against his will. (D.S.M.F. ¶ 107.)

5

After multiple requests and explanations, Shulenburg appeared to agree to go to the hospital voluntarily. (D.S.M.F. ¶ 108.) Shulenburg asked to go inside his house to put on his shoes; Officer Jamieson accompanied him, fearing that he may fall again. (D.S.M.F. ¶ 109.) Shulenburg put on his shoes and began to walk out of the basement. (D.S.M.F. ¶¶ 110-111.) Jamieson walked out of the basement into the connected garage first. (D.S.M.F. ¶ 112.) When Jamieson exited the door to the garage, Shulenburg closed the door and locked it behind him. (D.S.M.F. ¶¶ 112-113.) Jamieson knocked and requested that Shulenburg open the door. (D.S.M.F. ¶ 114.) Shulenburg did not respond. (D.S.M.F. ¶ 115.) Jamieson kicked the door open, claiming that he feared for Shulenburg's safety. (D.S.M.F. ¶¶ 116.) Upon re-entering the basement, Jamieson noticed that the lights were off and Shulenburg was hiding behind the door. (D.S.M.F. ¶ 119.) A physical confrontation ensued, the nature and extend of which is disputed.

Defendants claim that Shulenburg began flailing and pushing Jamieson away, but that Jamieson was able to grab hold of Shulenburg's right arm and pull him through the door into the garage. (D.S.M.F. ¶¶ 120-121.) Jamieson subdued Shulenburg by holding his right arm behind his back while using his other arm to reach across Shulenburg's body so that he would not fall or go to the ground. (D.S.M.F. ¶¶ 122.) Eaton grabbed Shulenburg's left arm. (D.S.M.F. ¶ 123.) Shulenburg continued to resist throughout this entire confrontation, saying that he "wasn't going anywhere." (D.S.M.F. ¶ 124.) The officers placed Shulenburg in handcuffs behind his back. (D.S.M.F. ¶¶ 125-126.) According to defendants, this whole process took approximately ten seconds. (D.S.M.F. ¶ 127.)

Shulenburg disputes this version of events. He maintains that he did not flail or push the officers but that they attacked him, causing injuries. (P.S.M.F. ¶¶ 3-4.) He alleges that the officers broke his finger, hurt his wrists, and punched him in the kidney

6

four times. (P.S.M.F. ¶ 2.) Shulenburg asserts that Jamieson exclaimed that he was "really starting to piss me off" and "I am sick of this fucking shit." (P.S.M.F. ¶ 4; Shulenburg Aff. ¶ 9.) This is corroborated by Attorney Guillory, who was on the phone with Shulenburg at the time. (Guillory Aff. ¶ 4.)

Once restrained, Shulenburg was walked to a stretcher and then to Arundel Rescue to be transported to the hospital in protective custody. Shulenburg was placed on the stretcher at a 45-degree angle with his hands cuffed behind him. (D.S.M.F. ¶ 130.) Shulenburg complained the handcuffs were too tight, "practically cutting off his circulation." (D.S.M.F. ¶ 131.) Jamieson removed Shulenburg's handcuffs from behind his back and replaced them on Shulenburg's wrists in the front. (D.S.M.F. ¶ 132.) While changing the handcuffs, Jamieson noticed that Shulenburg had several cuts on his hands that were bleeding. (D.S.M.F. ¶ 133.) At the hospital, Shulenburg also complained of wrist abrasions and a sprained finger, for which he was given a splint to wear. (D.S.M.F. ¶¶ 134.)

When he arrived at the hospital, Shulenburg was evaluated by Dr. Nilson. (D.S.M.F. ¶¶ 101-105.) Shulenburg remained largely uncooperative. (D.S.M.F. ¶ 101.) Shulenburg was released from the hospital after approximately two hours and after Dr. Nilson believed he had gained the capacity to refuse treatment. (D.S.M.F. ¶¶ 102-105.)

## II. Standard of Review

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821. When deciding a motion for summary judgment, the court reviews the

7

evidence in the light most favorable to the non-moving party. *Id.* In order to survive defendants' motion for summary judgment, plaintiff must set forth a prima facie case of each element of his cause of action. *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346.

## III. Discussion

### A. Excessive Force

The reasonableness of force employed by a police officer is analyzed under the Fourth Amendment standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The central question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* This test requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.[1] The issue before the court on summary judgment is whether the record, viewed in the light most favorable to Shulenburg, raises a "genuine dispute as

---

[1] Some courts have determined that restraint of a person's liberty for purposes of rendering medical assistance does not constitute a "seizure" within the meaning of the Fourth Amendment, thus removing a necessary predicate for asserting claims of constitutional violations, including an excessive force claim. *See Mills v. Hull*, 2008 U.S. Dist. LEXIS 45054 (E.D. Mich. 2008) (restraint of individual while trying to render medical aid does not "seize" the person for purposes of Fourth Amendment analysis); *Peete v. Metro. Gov't*, 486 F.3d 217, 222 (6th Cir. 2007) (restraint by paramedics rendering on-scene medical aid to a person in the throes of epilepsy not a Fourth Amendment seizure). *But see Champion v. Outlook Nashville*, 380 F.3d 893 (6th Cir. 2004) (restraint of autistic person held a seizure under Fourth Amendment); *Schreiner v. City of Gresham*, 681 F. Supp. 2d 1270 (D. Ore. 2010) (restraint and taser of diabetic woman to administer medical treatment a seizure within meaning of Fourth Amendment). A Fourth Amendment seizure occurs when there "an intentional acquisition of physical control" in circumstances in which "a reasonable person would have believed that he was not free to leave." *Bower v. County of Inyo*, 489 U.S. 593, 596 (1988). Apart from his constitutional claim under the Fourth Amendment, however, plaintiff has also asserted a state common law excessive force claim. The "analysis of the state law claims of illegal arrest and excessive force is the same as for the federal law claims." *Richards*, 2001 ME 132, ¶ 31, 780 A.2d 281, 292.

8

to the reasonableness of the force used by the officers." *Richards v. Town of Eliot*, 2001 ME 132, ¶ 17, 780 A.2d 281.

Plaintiff claims defendants broke down his door; that he did not resist arrest; and that the officers nonetheless attacked him, breaking his finger, hurting his wrist, and punching him four times in the kidney. (Pl.'s Opp'g S.M.F. ¶ 2.) Defendants on the other hand claim that Shulenburg physically resisted transport and thus necessitated the use of force. The nature and extent of Shulenburg's injuries are also disputed. While the extent of injuries may be considered in determining whether the force used was reasonable under the facts and circumstances of a particular case, even minor injuries may support a claim of excessive force. *See Richards*, 2001 ME 132, ¶ 20, 780 A.2d 281.

Given the conflicting versions of what transpired surrounding the confrontation with and eventual restraint of plaintiff, there clearly are genuine issues of material facts in dispute as to whether the officers used an appropriate level of force. Because the record must be viewed in the light most favorable to the plaintiff as the non-moving party in the context of a summary judgment motion, the court cannot conclude as a matter of law that he does not state a claim or that defendants are entitled to summary judgment on that claim.[2]

---

[2] Defendants argue that they are entitled to discretionary immunity under the Maine Tort Claims Act ("MTCA") from the state law excessive force claim. (Def.'s Mot. Summ. J. 14-16.) Because there are questions of material fact relating to plaintiff's excessive force claim (and the defense of qualified immunity, *see infra*) summary judgment in defendants' favor in relation to the state law excessive force claim is denied as well. *See id.*; *see also McCue v. City of Bangor*, 838 F.3d 55, 65 (1st Cir. 2016) ("For the same reasons [given in relation to plaintiff's Constitutional excessive force claim], granting immunity under the MTCA for the corresponding state law assault and battery claim is improper at the summary judgment stage").

9

## B. Qualified Immunity

Defendants contend that even if there is a valid excessive force claim, they are entitled to qualified immunity. Government officials may be shielded from liability for civil damages arising out of the performance of discretionary duties as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Richards*, 2001 ME 132, ¶ 23, 780 A.2d 281, *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a two-prong analysis is involved in determining whether qualified immunity applies: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Ciolino v. Gikas*, 861 F.3d 296, 303 (1st Cir. 2017). The "clearly established" prong has two parts.

First, there must be "controlling authority or a consensus of cases of persuasive authority that broadcasts a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *McKenney v. Mangino*, 873 F.3d 75, 81 (1st Cir. 2017). This does not require a "case directly on point"; but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548 (2017) *quoting Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015) (per curiam).

Next, the court must "evaluate whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id*. The "ultimate inquiry [is] whether a reasonable factfinder could conclude that the defendant['s] conduct was so deficient that no reasonable officer could have made the same choices under the circumstances." *Conlogue v. Hamilton*, No. 1:16-CV-296-GZS,

10

2017 U.S. Dist. LEXIS 187170, at *26-27 (D. Me. Nov. 13, 2017), *quoting Estate of Bennett v. Wainwright*, 548 F.3d 155, 168 (1st Cir. 2008).

In *Richards v. Town of Eliot,* the Law Court vacated a grant of summary judgment in favor of police officers on a claim of excessive force involved in arresting Ms. Richards for a nonviolent offense. The Court cited numerous cases[3] to support its conclusion that the "clearly established" prong of the qualified immunity test had been met in the circumstances presented that case, namely the arrest of a woman for a nonviolent offense who was not a threat to the officers' safety with the use of force sufficient to knock her down and then handcuff and handle her so as to cause "severe pain;" and that this constituted conduct that was "excessive and unreasonable." *Richards*, 2001 ME 132, ¶ 27, 780 A.2d 281. Though none of the cases cited by the Court were identical to the circumstances in *Richards*, "the number of cases with *similar* factual scenarios"

---

[3] The Court noted:

> "The federal court for the District of Maine has held that police officers in similar situations using similar degrees of force had violated plaintiffs' constitutional rights. In each of the following cases the court denied summary judgment to the police officers on the excessive force claim and the qualified immunity defense, thereby determining that the plaintiff's version of the facts was sufficient, if believed by the factfinder, to support a judgment against the officers: *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219 (D. Me. 1996) (after arresting plaintiff for operating under the influence, police rammed plaintiff's head into door jamb, causing him to fall and hit his head on the floor); *Barber v. Guay*, 910 F. Supp. 790 (D. Me. 1995) (after arresting plaintiff for theft, deputy wrenched plaintiff's shoulder; twisted his wrist behind his back; and threw him into the cruiser head first); *Brooks v. Bailey*, 1995 U.S. Dist. LEXIS 18733, No. 95-22- P-H 1995 WL 746340 (D. Me. Dec. 8, 1995) (in arresting plaintiff for criminal trespass, police pushed him against a tree; jerked his handcuffs; banged his head against the cruiser; pushed him into cruiser so he ended up face down on floor; and pulled him out by his feet causing him to fall face down on ground); *McPherson v. Auger*, 842 F. Supp. 25 (D. Me. 1994) (police handcuffed plaintiff's wrists too tightly and refused to loosen them after plaintiff was arrested for refusing to sign a traffic ticket); *McLain v. Milligan*, 847 F. Supp. 970 (D. Me. 1994) (in arresting plaintiff for disorderly conduct, police twisted plaintiff's arms behind his back; picked him up off the floor and carried him out of apartment; kicked his legs out from under him; forced him to his knees; slammed his chest and face onto concrete; kneed him in his back; and slammed his face onto the pavement)."

*Richards*, 2001 ME 132, ¶ 26, 780 A.2d 281.

11

holding the force used to be excessive "would have made it clear to a reasonable police officer" that the force alleged to have been used against Richards could be held unlawful. *Id.* (Emphasis added.)

Defendants contend that this case is distinguishable from *Richards* in numerous respects, including: Shulenburg is male; he was resisting arrest and disobeying lawful commands; he presented a threat to the officers; he was not knocked to the ground; and his injuries were not as pronounced as those of Ms. Richards upon examination at the hospital. *See* Defendants' Reply Memorandum, at 4. True, the instant case does not involve some of the pertinent facts in *Richards*; however, in light of the record the differences are not so material as to support summary judgment.

There are facts in dispute concerning the circumstances prompting the officers' use of force to take Shulenburg into protective custody as well as the nature and extent of the force employed. Plaintiff alleges that defendants were frustrated and angry with him; aggressively and without provocation grabbed and cuffed him; applied the handcuffs forcefully and in a manner that injured his wrists; forcibly injured his finger and punched him in the kidneys multiple times.[4] Viewing the record in the light most favorable to plaintiff, the court cannot conclude as a matter of law that defendants are entitled to invoke qualified immunity at this stage of the case. Even though this case did not involve an arrest for purposes of enforcing a violation of law, *Richards* and the caselaw it cited present a sufficient foundation of authority to give a "clear signal" to a reasonable police officer about what conduct "falls short of the constitutional norm." The conduct alleged by Shulenburg (which the officers deny) may or may not bear out

---

[4] Defendants take issue not only with the nature of the force Shulenburg alleges but also with the extent of injuries he claims to have suffered. *See, e.g.,* (Def.'s Repl. 5-6; Def.'s Add'l S.M.F. ¶ 2.) Under *Richards*, the extent of injuries is only a factor involved in the excessive force analysis. *Richards*, 2001 ME 132, ¶ 20, 780 A.2d 281. These are issues properly addressed at trial.

12

at trial. In the context of a motion for summary judgment, however, it is sufficient to overcome the defense of qualified immunity. Consequently, the motion for summary judgment is denied as to count I.

## C. Maine Civil Rights Act Claim Based on 34-B M.R.S. § 3862.

Count II asserts a claim under section 4682(1-A) of the Maine Civil Rights Act, which authorizes a private right of action against one who "intentionally interferes or attempts to intentionally by physical force or violence" with a person's rights under the law. 5 M.R.S. § 4682(1-A). The claim in count II is expressly predicated on the assertion that defendants "intentionally interfered by physical force with plaintiff's statutory right not to be involuntarily hospitalized" under 34-B M.R.S. § 3862.[5]

Section 3862(1) authorizes a law enforcement officer to take a person into protective custody if there is probable cause to believe that the person "may be mentally ill and due to that condition the person presents a threat of imminent and substantial physical harm" to himself or others. *Id.* § 3862(1). Defendants were not acting pursuant to section 3862(1). There is no suggestion that they were attempting to place Shulenburg in protective custody on the basis of mental illness or because he needed involuntary hospitalization for psychiatric reasons.

Defendants assert, and the court agrees, that they had authority and probable cause to take plaintiff into protective custody for emergency medical reasons. For authority, they rely on Maine Department of Public Safety regulations, specifically the Medical Direction and Practice Board (MDP) protocols of the Emergency Medical

---

[5] Count II does not assert a civil rights claim based generally upon false imprisonment or upon illegal seizure, nor upon a claim of unlawful entry into his residence in violation of his Fourth Amendment rights. (And plaintiff did not address defendants' arguments on the latter issue in his opposition to defendants' motion for summary judgment, and therefore that issue is waived. *See Mehlhorn v. Derby,* 2006 ME 110, ¶ 11, 905 A.2d 290.)

13

Services Bureau. (D.S.M.F. ¶¶ 58-59.) The protocols include procedures for treatment and transport of patients. Once a determination of medical urgency is made, if a patient refuses to be transported a further determination is made as to whether the person has capacity to make that decision. A patient without decision-making capacity is "one who has one of the following: altered mental status or intoxicated, confused, delirious, psychotic, comatose, unable to understand the language, or is a minor, etc." (D.S.M.F. ¶ 64.) Here, the paramedic on scene concluded that Shulenburg did not have decision-making capacity based on a potential head injury; observed symptoms of combativeness and other behaviors; had concerns about Shulenburg's mixed use of alcohol and prescription medications and about his irrational disregard of the potential risk of serious harm and even death posed without immediate medical evaluation. Dr. Nilson at Medical Control confirmed and directed that Shulenburg be transported to the hospital, either voluntarily or by protective custody. (D.S.M.F. ¶¶ 65, 66, 70-76.)

Probable cause is determined under an objective standard. *State v. Parkinson*, 389 A.2d 1, 8 (Me. 1978). The court's determination of whether the involuntary transport was reasonable "turns on whether an objectively reasonable officer would have believed he had probable cause to take [plaintiff] into protective custody . . . ." *Alfano*, 847 F.3d at 79.

Plaintiff contends that defendants lacked probable cause because of the conflicting opinion given by Shulenburg's primary physician that he had the present decision-making capacity to refuse treatment (though Dr. Major concurred that he should be transported to the hospital). At the same time, Dr. Major was not present at the scene and did not have all of the information that was available to the on-scene paramedic and Dr. Nilson at Medical Control. Even in light of the conflicting opinions being offered, based on the information available at the time an objectively reasonable

14

officer would have been justified in believing that medical urgency existed, further medical evaluation was necessary, and Shulenburg was confused to the point where he was incapable of making a rational decision. This was sufficient to establish probable cause to take plaintiff into protective custody. *See, e.g. Alfano v. Lynch*, 847 F.3d 71, 79 (1st Cir. 2017), *citing Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004) (For probable cause, facts known at time would have had to 'give rise to a reasonable likelihood,' of intoxication and incapacity); *Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 590-91, 594 (10th Cir. 1999) (probable cause to take incapacitated individual into protective custody under a municipal civil protection policy.)

The court concludes that defendants had authority and probable cause to take Shulenburg into protective custody. The issue is whether they exercised their authority in a manner that was unreasonable and involved use of excessive force—and that is the essence of the claim in count I. Summary judgment as to count II is granted.

## D. Punitive Damages

Defendants' request for summary judgment on the claim of punitive damages is denied. Punitive damages are available when express or implied malice is found by clear and convincing evidence. *Batchelder v. Realty Res. Hosp., LLC*, 2007 ME 17, ¶ 13, 914 A.2d 1116, *citing Tuttle v. Raymond*, 494 A.2d 1353, 1361-1363 (Me. 1985). Plaintiff has asserted facts which support at least a *prima facie* punitive damage claim, including the element of malice, such as the alleged statements made by the officers at the time as recounted above. Though disputed, these and other allegations establish a basis for a *prima facie* case sufficient to survive summary judgment.

## Conclusion and Order

For the foregoing reasons, there are questions of material fact concerning whether defendants used excessive force in taking Shulenburg into protective custody in order

15

to transport him to the hospital and whether the defense of qualified immunity is available. Defendants' motion for summary judgment is therefore denied as to plaintiff's excessive force claim in count I. As to count II, plaintiff has not established a violation the Maine Civil Rights Act as set out therein; has not established that defendants lacked probable cause to take him into protective custody; and/or or has waived any additional claims in count II. Partial summary judgment is warranted as to count II.

Accordingly, it is hereby ordered and the entry shall be: "Defendants' motion for summary judgment granted as to count II and denied as to count I."

The clerk may incorporate this Memorandum of Decision and Order on Motion for Summary Judgment by reference on the docket pursuant to M.R. Civ. P 79(a).

SO ORDERED.

Dated: June 13, 2018

Wayne R. Douglas
Justice, Superior Court

ENTERED ON THE DOCKET ON: 6|14|8

16