# United States Court of Appeals
## For the First Circuit

No. 23-1767

JADEN BROWN,

Plaintiff, Appellee,

v.

SAM DICKEY, individually and as an employee of the Cumberland
County Sheriff's Department; DANIEL HASKELL, individually and as
an employee of the Cumberland County Sheriff's Department,

Defendants, Appellants.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

_____

Before

Gelpí, Montecalvo, and Aframe,
Circuit Judges.

_____

    John J. Wall, III, with whom Monaghan Leahy, LLP was on brief,
for appellants.
    Jeremy W. Dean for appellee.
    Jaba Tsitsuashvili, Institute for Justice, Daniel Greenfield,
George Mills, and Roderick & Solange MacArthur Justice Center were
on brief for the Roderick and Solange MacArthur Justice Center and
the Institute for Justice, amici curiae.

_____

September 3, 2024

_____

**AFRAME**, **Circuit Judge**.  This is an interlocutory appeal by two Cumberland County, Maine jail correction officers, Daniel Haskell and Sam Dickey, from an order denying summary judgment based on qualified immunity.  The case, asserting violations of 42 U.S.C. § 1983 and the Maine Civil Rights Act, Me. Rev. Stat. Ann. tit. 5, § 4682, stems from an allegation brought by an individual who was previously incarcerated, Jaden Brown, that Haskell and Dickey violated her Fourth Amendment rights by observing her naked body during her stay at a local hospital to deliver a baby.[1]

Haskell and Dickey's primary argument is premised on a challenge to the district court's determination that there are sufficient facts for a jury to conclude that they viewed Brown's naked body in a manner that was more than inadvertent, occasional, casual, or restricted.  An argument that the district court erroneously identified factual disputes as the basis for denying summary judgment premised on qualified immunity is not the proper subject of an interlocutory appeal.  Thus, we lack jurisdiction over most of this appeal.  To the extent Haskell and Dickey contend that observing Brown's body in the manner described does not

---

[1]    "[T]he protections provided by the Maine Civil Rights Act, including immunities, are coextensive with those afforded by 42 U.S.C. § 1983." Est. of Bennett v. Wainwright, 548 F.3d 155, 178-79 (1st Cir. 2008).  We therefore will treat the disposition of the § 1983 claim as controlling the outcome of the Maine Civil Rights Act claim.  Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007) (citing Dimmitt v. Ockenfels, 220 F.R.D. 116, 123 (D. Me. 2004)).

- 2 -

constitute a search under the Fourth Amendment, we reject that claim based on clearly established circuit law.

## I.

We begin by describing the facts from the summary judgment record in the light most favorable to Brown. See Norton v. Rodrigues, 955 F.3d 176, 179 (1st Cir. 2020).

In July 2018, Brown, who was then pregnant, began serving a 15-month sentence at the Cumberland County Jail in Portland, Maine. Brown went into labor on the morning of February 10, 2019. Jail officials transported Brown to Maine Medical Center at around 11 a.m. Brown did not give birth until around 1 a.m. the following day.

During Brown's hospital stay, Brown was continuously accompanied by jail officials. At first, Officer Angel Dufour stayed with Brown. Brown invited Dufour to remain with her in the hospital room. During Dufour's shift, Haskell was in Brown's room for about an hour between 6:30 p.m. and 7:30 p.m. Dickey and Officer Carrie Brady replaced Dufour at about 10:45 p.m. Haskell, who supervised Dickey and Brady, was present for the shift change and remained in and around Brown's hospital room until at least approximately 11:30 p.m. Haskell and Dickey both had engaged previously in inappropriate conduct with females who were incarcerated. For his part, Dickey had been demoted for an inappropriate relationship with a female who was incarcerated.

- 3 -

And, according to Brown, she previously watched females who were incarcerated strip naked for Haskell.

At the end of the shift change, Dufour reminded Dickey that jail policy prevented officers from being in "the delivery room when [a person who is incarcerated] is giving birth." Dickey responded, "OK." This policy was consistent with Maine law, which instructs that "[w]hen a prisoner . . . is admitted to a medical facility . . . for labor or childbirth, a corrections officer may not be present in the room during labor or childbirth unless specifically requested by medical personnel." Me. Rev. Stat. Ann. tit. 30-A, § 1582(4). There was no such request from medical personnel here.

Despite the reminder by Dufour and the applicable Maine statute, Dickey and Brady sat in Brown's hospital room continuously throughout Brown's labor and delivery until the following morning after Brown's child was born. Brown's hospital room was large. Brown's bed was in the back corner of the room next to a bench that was a few feet away. Dickey sat on the left side of the bench, within two feet of Brown's legs as she lay in bed. According to Brown, Dickey was close enough to her that she could have touched him. Brady sat on the other end of the bench, within four feet of Brown. Brown perceived that Dickey and Brady were positioned "so that they could see, hear, and smell everything that was happening while [Brown] labored and delivered her baby."

- 4 -

Haskell also repeatedly entered and exited Brown's room, although he denies being present when Brown delivered the baby.

Prior to the delivery, Dickey watched television, napped, and laughed at jokes told by Haskell. For example, Haskell said to Brown that she and her baby constituted "one and a half inmates" and suggested that she should name her daughter after the jail. Haskell also raised with Brown a recent allegation by another incarcerated female who had accused him of having sex with her. Haskell made disparaging comments about this other female's appearance. He also denied the allegation, asking Brown, "You know my type. Is she my type?" Based on prior observations, Brown understood Haskell to prefer young, petite, blonde women.

During Brown's hospital stay, medical personnel conducted multiple examinations of Brown's cervix. These examinations required Brown to spread her legs so that medical personnel could insert gloved fingers into her vagina to manually check the dilation of her cervix. Brown stated specifically that Haskell was present for one of these exams when he was in her hospital room at about 7:30 p.m. In addition to these cervix exams, Brown received an epidural and a urinary catheter. The medical personnel also occasionally monitored the baby's heartbeat, which required them to expose Brown's stomach and breasts. Just prior to the birth, medical personnel held Brown's legs in the air so that she could push. As Brown delivered, Dickey

wrote in the jail hospital log, "Delivery happening!", "Pushing . . . ", and "Baby girl born!"

According to Brown, the medical personnel did their best to cover her body with a johnny and sheet during the cervical examinations. Nevertheless, Brown says there were times when her breasts and vagina were exposed. Brown's genitals were completely exposed during the actual delivery because medical personnel could not cover her with a sheet while lifting her legs in the air.

Haskell and Dickey both denied that they observed Brown's breasts or genitals while in the hospital room. Brown admitted that she did not ask Haskell or Dickey to leave the hospital room because, even though she felt "embarrassed" and "numb," "when you're naked and your legs are spread open it's just like -- it's over. Let's just get it done with." Brown also acknowledged that she cannot say with certainty what any particular officer saw during the delivery because she was focused on the medical personnel while trying to deliver. Brown was released from custody within 48 hours of delivering her baby.

Based on the events at the hospital, Brown filed claims against the jail, jail supervisors, and the corrections officers on scene, including Haskell and Dickey. The complaint against Haskell and Dickey alleged that their conduct violated the Fourth, Eighth, and Fourteenth Amendments of the United States

Constitution. On appeal, the parties focus on the Fourth Amendment claim, and so will we.

Following discovery, Haskell and Dickey sought summary judgment, asserting qualified immunity. The district court denied the motion. The court identified Cookish v. Powell, 945 F.2d 441, 447 (1st Cir. 1991), as holding that a prison guard of the opposite sex from an incarcerated person violates that person's Fourth Amendment rights by observing the person's naked body, if the observations were "other than inadvertent, occasional, casual, and/or restricted," unless emergency circumstances were present. Id.

The district court held that there were genuine issues of material fact on whether Haskell and Dickey violated the Cookish standard by observing Brown's naked body. The court noted that the record was "replete with facts that cast doubt" on Haskell and Dickey's assertion that they did not view Brown naked while she was in the hospital. The court also ruled that Haskell and Dickey's alleged observations of Brown's naked body, if such observations occurred, would constitute searches under the Fourth Amendment.

**II.**

**A.**

Haskell and Dickey's primary argument on appeal is based on the predicate assertion that "[t]here is no evidence in the

summary judgment record that [they] made any observation of Brown's naked body -- let alone that they made more than inadvertent, occasional, casual, and/or restricted observations of her naked body." From that assertion, Haskell and Dickey contend that the law was not clearly established that their mere presence in Brown's hospital room, without observing Brown's naked body, constituted a violation of Brown's Fourth Amendment rights.

We do not have jurisdiction to consider this argument. Generally, courts of appeals lack jurisdiction over appeals from orders denying summary judgment because such orders lack finality. See McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017) (citing 28 U.S.C. § 1291). There is an exception, however, for orders denying summary judgment based on assertions of qualified immunity where the argument for immunity presents a question of law. Cady v. Walsh, 753 F.3d 348, 350 (1st Cir. 2014) (citing Johnson v. Jones, 515 U.S. 304, 313 (1995)).

Qualified immunity, which shields an officer from civil liability unless the officer violates clearly established law of which a reasonable officer would have known, is an immunity from suit and damages. See Ortiz v. Jordan, 562 U.S. 180, 188 (2011). Because qualified immunity is an immunity from suit, an officer's claim of qualified immunity "ought to be resolved as soon as possible in [the] litigation." Norton, 955 F.3d at 183.

But not all orders denying summary judgment premised on qualified immunity are immediately appealable. Only "[p]urely legal rulings" implicating qualified immunity receive expedited appellate consideration. Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017). Thus, a challenge to a district court's ruling that the facts, taken in the light most favorable to the plaintiff, demonstrate a violation of clearly established law may be considered on interlocutory appeal. See McKenney, 873 F.3d at 80. When, however, the court's order denying qualified immunity is based only on "an issue of fact or an issue perceived by the trial court to be an issue of fact," we do not have appellate jurisdiction. Id. (quoting Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 1995)). Thus, we lack jurisdiction when the defendant-officer's argument for qualified immunity rests on a claim that "the facts asserted by the plaintiff[] are untrue, unproven, warrant a different spin, tell only a small part of the story, [or] are presented out of context." Id. at 80-81 (quoting Díaz v. Martínez, 112 F.3d 1, 5 (1st Cir. 1997)).

Haskell and Dickey's argument that their mere presence in the hospital room did not violate clearly established law exceeds the jurisdictional limit. Their argument is premised on a contention that they did not observe Brown's naked body. But the district court concluded there was a genuine issue of fact on that question. And this issue of fact is material because, as

- 9 -

mentioned earlier, in this circuit, it is established that a Fourth Amendment violation occurs when a prison guard of the opposite sex, in nonemergency circumstances, views an incarcerated person's naked body in a manner that was "other than inadvertent, occasional, casual, and/or restricted." Cookish, 945 F.2d at 447. Therefore, Haskell and Dickey's argument for qualified immunity on the ground that they were merely present in Brown's hospital room, without observing Brown's naked body, does not constitute a purely legal question appropriate for interlocutory appeal because it is premised on facts which the district court determined are in dispute.

Haskell and Dickey argue otherwise by pointing to what we have called an "isthmian exception" to the limits on interlocutory appeals of qualified-immunity denials at summary judgment. McKenney, 873 F.3d at 81 n.4. The exception derives from Scott v. Harris, 550 U.S. 372, 380 (2007), a case also involving qualified immunity for a Fourth Amendment claim. The district court had denied summary judgment premised on qualified immunity because of purported factual disputes resulting from the testimony of the plaintiff about his interaction with the defendant police officer. Id. at 376. As discussed above, such a ruling denying summary judgment based on a factual dispute would typically preclude an interlocutory appeal of the qualified immunity question. But, in Scott, there was also a videotape of the

- 10 -

plaintiff's interactions which demonstrated that the plaintiff's version of events was false. Id. at 378-79.

The Supreme Court held that, in such circumstances, the district court should have treated the undisputed facts as being established by the videotape. As the Court explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. Thus, when the evidence indisputably supports only the defendant's version of events -- even though the plaintiff testified otherwise -- the defendant may bring an interlocutory appeal challenging the denial of qualified immunity premised on the incontrovertibly established facts.

Haskell and Dickey contend that the Scott exception saves their interlocutory appeal. They say that Brown's Fourth Amendment claim requires record evidence that they observed Brown's naked body in the manner proscribed by Cookish. They then assert that there is no such evidence here because they "testified that they did not view or observe Brown's naked body," and "Brown could not dispute that testimony based on her own personal knowledge." Because Brown could not testify from personal knowledge that they saw her naked body and did not present witness testimony or "physical evidence" to establish that such

observation definitively occurred, Haskell and Dickey contend the record supports only one conclusion: they did not observe Brown naked. Thus, they argue the summary judgment record presents only the purely legal question of whether it was clearly established that their mere presence in Brown's hospital room, without observing Brown's naked body, violated Brown's Fourth Amendment rights.

We reject this argument, which suffers from a misunderstanding about the roles played by direct and circumstantial evidence in identifying factual disputes. Direct evidence "is that which proves a fact without an inference or presumption and which in itself, if true, establishes that fact." Barbara E. Bergman et al., 1 Wharton's Criminal Evidence §1.8 (15th ed. 2023) (internal citations omitted). For example, if a witness testified that she saw the defendant shoot the victim that would be direct evidence that the defendant was the shooter. Circumstantial evidence is evidence from which the factfinder may infer the fact in dispute. Id. Using the same example, if evidence established that the defendant was the only person in a house when a victim was shot, that would be circumstantial evidence that the defendant was the shooter. Id.

The law draws no distinction between the value of circumstantial and direct evidence. United States v. Ruiz, 105 F.3d 1492, 1500 (1st Cir. 1997). "The reason for treating

circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (quoting Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 508 n.17 (1957)). Haskell and Dickey rely solely on the direct evidence of their own self-serving statements that they did not see Brown's naked body. But they ignore the circumstantial evidence.

The circumstantial evidence against Dickey is strong. Dickey was in the hospital room during the duration of Brown's delivery, within a few feet from Brown's bed, where, according to Brown, Dickey "could see, hear, and smell everything that was happening." During that time, Brown underwent multiple procedures and tests during which her body was exposed. And when Brown delivered, medical personnel held her legs in the air exposing her genitals as Dickey sat nearby. Dickey made notes of his observations in real time writing, "Delivery happening!", "Pushing . . . ", and "Baby girl born!" This is all circumstantial evidence from which a factfinder reasonably could conclude that Dickey was watching Brown while she gave birth and thus observed Brown's naked body. Thus, as it pertains to Dickey, this case is nothing like Scott because the record fails to establish to a certainty that Dickey did not view Brown's naked body. 550 U.S. at 380.

We reach a similar conclusion for Haskell. The record establishes that Haskell was in Brown's hospital room for periods of time before Brown gave birth, in close enough proximity to converse with Brown and make jokes. Brown also says that, during the periods when Haskell was in her hospital room, she underwent multiple procedures, including a cervix examination, which required her to be exposed. The district court's order denying summary judgment explained that the record evidence was sufficient, in its view, to establish a disputed fact on whether Haskell observed Brown's naked body. That conclusion is sufficient to displace our appellate jurisdiction. When the district court denies qualified immunity "based on an issue perceived by the . . . court to be an issue of fact," McKenney, 873 F.3d at 80, we lack jurisdiction. There is no indisputable contrary evidence that would trigger the Scott exception to this rule.[2]

To summarize, the record evidence fails to incontrovertibly establish a single version of events showing that

---

[2] For the reasons discussed above, Haskell and Dickey's reliance on Harvey v. Campbell County, 453 F. App'x 557 (6th Cir. 2011), is misplaced. In Harvey, the Sixth Circuit considered an interlocutory appeal challenging a denial of qualified immunity because the district court committed a legal error in construing the summary judgment record. Id. at 561. The court erroneously found that there was a genuine issue of material fact "through reliance on the allegations of [the] complaint alone without any supporting factual evidence." Id. There was no similar error here. The district court denied summary judgment based on perceived disputes of fact arising from circumstantial evidence generated through discovery.

- 14 -

Haskell or Dickey did not observe Brown's naked body while they were in her hospital room. Accordingly, because the district court perceived a dispute of material fact on what Haskell and Dickey saw while in the hospital room, we lack jurisdiction over this appeal to the extent Haskell and Dickey argue for qualified immunity premised on the disputed assertion that they did not observe Brown's naked body.

**B.**

Haskell and Dickey also contend that, even if they had viewed Brown's naked body in the hospital room, there was no Fourth Amendment violation because they did not conduct a search of Brown's body. Because this argument assumes that Haskell and Dickey observed Brown's naked body, we have jurisdiction to consider it. McKenney, 873 F.3d at 80.

In evaluating an officer's assertion of a qualified immunity defense in a § 1983 action, we ask whether the officer violated the plaintiff's federal statutory or constitutional rights and whether the unlawfulness of the officer's conduct was clearly established at the time the officer acted. Bannon v. Godin, 99 F.4th 63, 84 (1st Cir. 2024). To survive a qualified immunity claim, the plaintiff must point to legal authority that places the statutory or constitutional question beyond debate. Ciarametaro v. City of Gloucester, 87 F.4th 83, 88 (1st Cir. 2023).

- 15 -

Haskell and Dickey say it was not clearly established that they violated Brown's Fourth Amendment rights by observing her naked body because there is no proof that they conducted a "search."[3] They emphasize that it is undisputed that they did not touch Brown, did not take steps to require Brown to expose herself, and were not present in the hospital room to collect evidence of a crime.

This argument is premised on too narrow a construction of the clearly established law defining a search. "A Fourth Amendment search occurs when the government infringes 'an expectation of privacy that society is prepared to consider reasonable.'" Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). We have previously held that a strip search can violate the Fourth Amendment because of the serious privacy "intrusion [that] stems from exposing one's naked body to official scrutiny." Wood v. Hancock Cnty. Sheriff's Dep't, 354 F.3d 57, 63 (1st Cir. 2003). We have defined a strip search broadly to encompass "an inspection of a naked individual, without any scrutiny of the subject's body cavities." Id. (quoting Blackburn v. Snow, 771 F.2d 556, 561 (1st Cir. 1986)). Crucially, there is no requirement that the officer

---

[3] In the circumstances presented here, there was obviously no seizure, which is another way that an officer's conduct could trigger Fourth Amendment scrutiny.

in question "set out deliberately to inspect a prisoner's naked body." Id. This understanding of the definition of a search is strengthened by our statement in Cookish that even regular observations of "personal activities, such as undressing, showering, and using the toilet" could amount to a Fourth Amendment violation under certain circumstances in the prison context. Cookish, 945 F.3d at 446.

Thus, a search under the Fourth Amendment does not require Haskell or Dickey to have touched Brown, caused Brown to have exposed herself, or be present for the purpose of collecting evidence of a crime. A search occurs when a jail official inspects an incarcerated individual's naked body, regardless of whether the official set out to do so. Wood, 354 F.3d at 63. If Haskell or Dickey inspected Brown's naked body in the hospital room, such an observation would constitute a search triggering Fourth Amendment scrutiny. Cookish provides the standard for determining whether that search was unlawful.

\* \* \*

For the reasons discussed, we **dismiss** this appeal in part for a lack of appellate jurisdiction and otherwise **affirm** the district court's denial of summary judgment.