# United States Court of Appeals
## For the First Circuit

No. 24-1351

IAN MILLER, personal representative of the Estate of Robert
Joseph Miller,

Plaintiff, Appellee,

v.

SPENCER JACKSON, in his individual capacity; SEAN ROYCROFT, in
his individual capacity,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Angel Kelley, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Alexandra M. Gill, with whom Douglas I. Louison and Louison,
Costello, Condon & Pfaff, LLP, were on brief, for appellants.
Matthew W.H. Wessler, with whom Robert Friedman, Gupta
Wessler LLP, Howard Friedman, Law Offices of Howard Friedman, PC,
Jeffrey Wiesner, Jennifer McKinnon, and Wiesner McKinnon LLP, were
on brief, for appellee.

September 10, 2025

**THOMPSON**, <u>Circuit Judge</u>.

**OVERVIEW**

Robert Miller died during a run-in with Barnstable police officers Sean Roycroft and Spencer Jackson at his Cape Cod home in 2019. He was 63. A big question is how this happened. The parties (whose names appear in our caption) give differing accounts. But at this stage, we (as will be seen) must credit Miller's representative's version if there's evidence to support it. And that's the version we set out here and throughout.

The tragedy impelling this litigation unfolded in just *minutes*. Responding to a 911 call from Miller's girlfriend that he "need[ed] a psych evaluation," Roycroft got to Miller's place at 7:09 p.m. (she made the call around 7:03 p.m. and reported no crime (to be clear)). Jackson got there about a minute later. And by 7:12 p.m. — after struggling to handcuff him while on the floor of the home's office area — the officers needed an ambulance for the now-lifeless Miller, who was pronounced dead at 8:00 p.m.

Miller's son (whom we'll just call "plaintiff") sued the officers on behalf of the estate, alleging a federal excessive-force claim. <u>See</u> 42 U.S.C. § 1983. Following discovery, the officers moved for summary judgment on qualified-immunity grounds. Qualified immunity (broadly speaking) protects them from this suit unless they violated clearly established constitutional norms. <u>See, e.g.,</u> <u>Plumhoff</u> v. <u>Rickard</u>, 572 U.S. 765, 778 (2014). But the

- 3 -

district judge (roughly speaking) thought that plaintiff raised triable issues because of questions concerning what reasonable jurors could infer about the officers' conduct (described more fully below) after "Roycroft and Miller tripped and fell to the floor in the office space area."  See Est. of Miller v. Roycroft, No. 21-CV-10738-AK, 2024 WL 1416066, at *12 (D. Mass. Mar. 31, 2024).  So the judge denied summary judgment on that aspect of the case.  See id. at *15.  The officers appealed.

After careful consideration of this interlocutory matter ("interlocutory," because the suit remains live in the district court), we **reverse** in part, **affirm** in part, and **dismiss** in part — sharing only those details needed to justify our decision (anyone interested in the full background can consult the district judge's opinion (cited in the preceding paragraph)).  See generally McKenney v. Mangino, 873 F.3d 75, 85 (1st Cir. 2017) (signaling that a "pretrial denial of qualified immunity is but a way station in the travel of a case," and adding that "[d]epending on the facts proven at trial and the inferences drawn by the jury, the defendant may or may not ultimately prevail on his qualified immunity defense" (quotation marks omitted)).

- 4 -

**GUIDING PRINCIPLES**

A little bit about the legal backdrop is helpful, as a sort of primer for what's to come.

Qualified immunity shields police officers from § 1983 suits unless the officers violated clearly established federal law apparent to a rational officer standing in their shoes when they acted. See, e.g., Pearson v. Callahan, 555 U.S. 223, 232, 234 (2009) (holding that the qualified-immunity defense turns on whether (1) the officers violated constitutional guarantees (2) that governing caselaw clearly established the violation when it occurred — adding also that courts can resolve the defense under the first or second prong, as there's no "rigid order of battle"). See generally Dist. of Columbia v. Wesby, 583 U.S. 48, 63-64 (2018) (remarking that while in the "rare" case a clearly established right may be "obvious," clearly establishing a right typically requires "'controlling'" caselaw or a "'consensus'" of "'persuasive'" caselaw that puts the constitutional question "'beyond debate"" (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741-42 (2011))); McKenney, 873 F.3d at 81 (discussing the qualified-immunity standard in exquisite detail). Summary judgment in these kinds of cases turns on whether the record — read most favorably to plaintiff, with every reasonable inference it permits — reveals a material-fact dispute barring the officers' qualified-immunity claim or shows their right to judgment as a matter of law. See,

e.g., Rivera-Corraliza v. Puig-Morales, 794 F.3d 208, 214 (1st Cir. 2015) (stressing that "[c]ourts penalize officers for violating 'bright lines,' not for making 'bad guesses in gray areas'" (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992))).

Orders *denying* summary judgment usually aren't immediately appealable. See, e.g., Johnson v. Jones, 515 U.S. 304, 309 (1995) (discussing 28 U.S.C. § 1291). And that's because they're not final orders in the traditional sense. See id. (noting that § 1291 "grants appellate courts jurisdiction to hear appeals only from 'final decisions' of the district courts"). An exception exists for a summary-judgment order denying a qualified-immunity request *if* the appeal is about *legal* issues. Id. at 317. Qualified immunity, you see, is a defense from suit — not just liability. Id. at 312. And forcing officers who lost on summary judgment to wait for a jury verdict before appealing would kibosh an essential piece of the defense. Id. But — an *important* but — while we have jurisdiction to resolve purely *legal* issues, we have *no* jurisdiction to resolve *fact* disputes. See id. Put most simply, "the interlocutory appeal to vindicate the right not to be tried is unavailable when there is no legal uncertainty; there is no separate 'right not to be tried' on the question whether the defendants did the deeds alleged; that is *precisely* the question for trial." Elliott v. Thompson, 937 F.2d 338, 341 (7th Cir.

- 6 -

1991).  See generally Brown v. Dickey, 117 F.4th 1, 6 (1st Cir. 2024) (stressing that we lack jurisdiction if the officers' appeal turns on their "claim that 'the facts asserted by the plaintiff[] are untrue, unproven, warrant a different spin, tell only a small part of the story, [or] are presented out of context'" (quoting McKenney, 873 F.3d at 80-81)).[1]

### WHAT HAPPENED

### Key Facts[2]

We now return to the scene of Roycroft and Miller lying on the office floor (which led to the conduct that the judge ruled *not* covered by qualified immunity) — viewing (as required) the evidence and all inferences from it in the light most sympathetic to *plaintiff*.  See, e.g., Rivera-Corraliza, 794 F.3d at 214.[3]

The men's face-down tumble — occurring as Roycroft had his arms wrapped around Miller's chest from behind — resulted in both of Miller's arms and Roycroft's left arm getting pinned under

---

[1] We confess that separating law-based appeals from fact-based appeals isn't always easy.  See Morse v. Cloutier, 869 F.3d 16, 22 (1st Cir. 2017).

[2] Although this should be obvious, we point out that the "facts" in this opinion may not be the "actual facts" decided at trial — they're just the facts for summary-judgment purposes.  See Eldridge v. Gordon Bros. Grp., L.L.C., 863 F.3d 66, 71 (1st Cir. 2017).

[3] The officers specifically state that "the sole use of force on which this appeal is focused" concerns the "segment of force" for "the events that occurred after Miller and Roycroft fell down to the floor in the office area."

Miller's body.  The 6'0" Roycroft — with his (estimated) 220 pounds of body weight and gear — had basically dropped on top of Miller, who (in turn) had landed on a golf club.  Finding himself sort of "on [Miller's] left side," Roycroft had his right leg over Miller's left leg and his right arm between Miller's shoulder blades. Miller tried to "lift his chest" up.  But Roycroft pushed down with his right arm to stop Miller "from creating that space" between Miller's chest and the floor.  Delivering a half-strength body punch to Miller's right side, Jackson hoped to "distract[]" him so he could pull Miller's "hands from underneath [Miller's] body" and cuff him.  But no such luck.  So Jackson — after radioing for backup at 7:11:52 p.m. — punched Miller again.

And that second hit changed everything, as shown by what happened over the next minute or so.  Roycroft freed his left arm. Jackson yanked Miller's right hand behind Miller's back and cuffed Miller's right wrist.  Roycroft grabbed Miller's left hand "[a]t the same time."  Miller's girlfriend — Amy Anderson — saw one of the officers drive a knee into Miller's back to gain leverage. She also heard Miller say, "I can't breathe" and "Amy, help me" (she said Miller said these things when the officers "were trying to put handcuffs on him," a point the officers don't dispute). Jackson ultimately got the cuffs on Miller's left wrist as well and "double-locked" them behind Miller's back.  And Roycroft "immediately reached down" to get Miller to his feet but could

not.  Roycroft then rolled Miller (whose pupils were fixed) onto his side (so Miller "wouldn't be face down"), saw he wasn't breathing and had no pulse, called for medical help at 7:12:58 p.m., and started CPR (an initialism for cardiopulmonary resuscitation, an emergency procedure used during cardiac or respiratory arrest).

An ambulance took Miller to a local hospital, where the staff declared him dead.  The medical examiner listed Miller's cause of death as "cardiac dysrhythmia in the setting of excited delirium [due to] unknown psychiatric illness at the time of the restraint."  But plaintiff's medical expert concluded that Miller died of a "prone restraint cardiac arrest" caused by the pressure Roycroft applied to Miller's back that impaired Miller's breathing.

For perspective's sake, we think it makes sense to divide the crucial facts into two phases (the phases' significance will become clear shortly):

| Timeline | | |
|---|---|---|
| ~7:10 p.m.<br><br>(Men fall to floor) | 7:11:52 p.m.<br><br>(Jackson's second punch) | 7:12:58 p.m.<br>(Roycroft calls ambulance) |
| **Phase One:**<br>Roycroft's arm is pinned | | **Phase Two:**<br>Roycroft's arm is free; officers cuff Miller |
| **Nature of Excessive Force:**<br>• Half of Roycroft's weight on Miller<br>• Forearm pressing down as Miller presses up | | **Nature of Excessive Force:**<br>• Knee on Miller's back |

**Key Rulings Below**

This brings us to the judge's summary-judgment order denying qualified immunity to Roycroft and Jackson.

*Constitutional Violation*

The judge first looked to see if plaintiff had shown that the officers' used constitutionally excessive force. Est. of Miller, 2024 WL 1416066, at *8.[4]  And applying factors that help determine whether an officer acted reasonably — the severity of the victim's crime (if any); the type of threat (if any) he posed to the officers or others; and his active resistance (or not) — the judge concluded (after reading the record in the right light)

---

[4] To clarify a possible point of confusion, plaintiff claims that Roycroft and Jackson applied excessive force themselves and that Jackson also failed to stop Roycroft's excessive force.

- 10 -

that plaintiff had shown exactly that. Id. at *9-12 (discussing Graham v. Connor, 490 U.S. 386, 396-97 (1989)).

Miller had committed no crime, the judge noted. Id. at *9. And "[a]lthough Roycroft's left arm being trapped underneath Miller may have been cause for concern," the judge saw no facts suggesting that "Roycroft was in danger." Id. at *11. Miller never had "a weapon," the judge added, and "[h]e never threatened [the officers] or Anderson, and he never struck anyone." Id. What's more, the judge found insufficient "facts" to "infer [that] Miller . . . deliberately trapp[ed] Roycroft's arm underneath his body." Id. Pointing to plaintiff's expert's deposition, the judge then found that the record raised "the inference that Miller struggled to cast Roycroft's weight from his back so he could breathe" — meaning "a genuine issue of material fact" existed "as to whether Miller actively resisted at all." Id. Based on their training and experience, the judge continued, Roycroft and Jackson knew about the "risk of restraint-related asphyxiation in this circumstance." Id.[5] So, the judge wrote, "a jury could find that

_____

[5] Among the significant evidence the judge cited was a "guidance" document "circulated" by the federal government that "warn[ed] of the risk of positional asphyxia resulting from the use of a prone restraint." Id. The record also shows — as the judge inferred — that Roycroft and Jackson knew that police officers should help persons having trouble breathing; that Roycroft knew that he could "reduce or eliminate" breathing problems for in-custody persons lying on their stomachs by getting them off their stomachs; that Jackson knew that factors like age, obesity, and physical condition could make it harder for persons

- 11 -

an objectively reasonable officer" in their position "would have concluded that Miller was struggling to breathe, not resisting arrest." Id.

And having explained how the Graham factors shook out, the judge ruled that "a jury could reasonably conclude that there was little or no need for the application of force against Miller, and that in light of his death, the force was excessive." Id. at *12.

*Clearly Established*

The judge then shifted to whether plaintiff had shown that the law was so clearly established that sensible officers would've known that they were breaking it. Id. at *12-14. And the judge concluded (after still approaching the record from the requisite plaintiff-friendly vantage) that plaintiff had done precisely that. Id.

Roycroft

Starting off, the judge found that a "reasonable jury could infer" that once the men fell to the floor, Roycroft "appl[ied] pressure on Miller's back" — first with "his right arm" and then with "his knee," while Miller "*was restrained*." Id. at

---

to breathe if they were left lying on their stomachs (the then-63-year-old Miller was 5'9", 214 pounds when this went down); that Jackson also knew that a person having difficulty breathing might "struggle," so as to get air into the lungs; and that Jackson knew too that officers should ease the pressure on a face-down person's back during a handcuffing.

*12 (emphasis added). And as Miller struggled to push up for deeper breathes, the judge mentioned, Roycroft pushed down to stop him. Id. Quoting McCue v. City of Bangor, 838 F.3d 55 (1st Cir. 2016), the judge next found it clearly established by "2012" — years *before* this incident — "that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." See Est. of Miller, 2024 WL 1416066, at *13 (quoting McCue, 838 F.3d at 64). From there, the judge noted that Abdullahi v. City of Madison, 423 F.3d 763 (7th Cir. 2005) — a case that helped form McCue's rule — held that an officer couldn't get

> qualified immunity at summary judgment where [he] "placed his right knee and shin on the back of [plaintiff's] shoulder area and applied his weight to keep [the detainee] from squirming or flailing" for 30 to 45 seconds, despite the fact that the detainee had "arch[ed] his back upwards as if he were trying to escape" in "a futile attempt to breathe."

Est. of Miller, 2024 WL 1416066, at *13 (first and third alterations added by us) (quoting Abdullahi, 423 F.3d at 771). Which led the judge to "find[]" it clearly established when Miller died that he "had a constitutional right to be free from an officer kneeling on his back after he had been restrained." Id.

Continuing, the judge also found a fact dispute on "whether either [officer] placed [a] knee on Miller's back,"

- 13 -

"whether they exerted any weight on Miller's back," and "whether Miller said he could not breathe or made a plea for Anderson's help." Id. But the judge emphasized that she had to resolve all disputed facts and draw all inferences in plaintiff's favor. Id. Having done all that, the judge ruled that Roycroft had fair notice "that subduing an unarmed and mentally unstable individual with compressive body weight who stated he *could not breathe* would violate that person's clearly established right to be free from excessive force" — and that a reasonable officer in his position would've known that. See id. (emphasis added).

So the judge held that Roycroft wasn't "entitled to" qualified immunity on summary judgment. See id.

Now might be a good time to make explicit what a reader may've already noticed — namely, that the judge's reasoning for denying Roycroft qualified immunity focused on Phase Two of the struggle, where Roycroft freed his arm and the officers cuffed Miller (we introduced the phases in the chart above[6]). Remember,

---

[6] For convenience, we reproduce the chart here:

after surveying McCue and Abdullahi, the judge ruled that Miller had a clearly established right not to have an officer "*kneeling on his back*" once "he had been restrained." See Est. of Miller, 2024 WL 1416066, at *13 (emphasis added). And because the kneeling occurred only after Roycroft freed his arm, the judge's ruling must relate to Phase Two.

### Jackson

Citing Davis v. Rennie, 264 F.3d 86 (1st Cir. 2001), the judge also considered it clearly established that officers like Jackson must intervene in another's excessive force when they see it and can reasonably stop it. Est. of Miller, 2024 WL 1416066, at *13 (discussing Davis, 264 F.3d at 102). Given the scanty info

| Timeline | |
|---|---|
| ~7:10 p.m. (Men fall to floor)       7:11:52 p.m. (Jackson's second punch)       7:12:58 p.m. (Roycroft calls ambulance) | |
| **Phase One:** Roycroft's arm is pinned | **Phase Two:** Roycroft's arm is free; officers cuff Miller |
| **Nature Excessive of Force:**<br><br>• Half of Roycroft's weight on Miller<br>• Forearm pressing down as Miller presses up | **Nature of Excessive Force:**<br><br>• Knee on Miller's back |

Jackson had when he first saw Roycroft and Miller, the judge ruled that "an objectively reasonable police officer" in his position would've thought "Miller might be dangerous and [would've] prioritized helping Roycroft" — thus making it "reasonable for Jackson to then punch Miller's torso in an attempt to free Roycroft's left arm." Id. at *14. But the judge found many fact disputes about "events immediately after that the jury must decide," including "how long Miller was on the floor" — plaintiff's expert estimated that "Roycroft applied pressure on Miller's back while attempting to handcuff him for approximately two minutes and fifteen or thirty seconds" (which meant Jackson had about "the same amount of time to determine whether his and Roycroft's use of force was excessive and that they needed to stop"); whether the officers "put his knee on [Miller's] back and if so, for how long" (Anderson saw one of the officers do it, but Roycroft doesn't remember doing it or seeing Jackson do it — though he concedes that either he or Jackson may have done it for a "few seconds"); and whether Jackson knew Miller was "struggling to breathe." Id. at *14 & n.2. "Jackson would be entitled to qualified immunity if his version of events is substantiated," the judge wrote, but not "if the fact finder believes [plaintiff's] version." Id. at *15.

So the judge held that she'd "wait until after the facts have been settled to determine whether" Jackson acted objectively reasonably for qualified-immunity purposes. Id.

- 16 -

Roycroft and Jackson then filed this interlocutory appeal.

## OUR CONSIDERED TAKE

### Reminders

Time to roll up our sleeves and decide how the case should come out. Keep a couple things in mind as we do (they should sound familiar). For one, to defeat qualified immunity plaintiff must not only prove a violation of a federal right, but of a *clearly established* federal right. See, e.g., Rivera-Corraliza, 794 F.3d at 214. For another, we can *only* resolve the officers' *legal* challenges — *not* challenges that "turn[] on either an issue of *fact* or an issue perceived by the [district judge] to be an issue of *fact*." See Morse, 869 F.3d at 22 (emphases added) (quoting Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 2017)); see also Cady v. Walsh, 753 F.3d 348, 361 (1st Cir. 2014) (holding that if "the defendants fail to pose . . . the qualified immunity question in a manner that would permit us to conclude that 'the answer to it does not depend upon whose account of the facts is correct,'" then "we lack the authority to provide an answer" (quoting Stella, 63 F.3d at 75)).

### Arguments and Analysis

#### *Setup*

Insisting that Roycroft's arm was stuck under Miller "until just before Miller was handcuffed," the officers' big-

- 17 -

picture argument — spanning Phases One and Two — is that no clearly established rule forbade the use of force that "occurred" before Miller was "restrained" through "handcuff[s]" (because the officers contest only the clearly established component of the qualified-immunity analysis, that's all we address (fyi)). Roycroft and Jackson cuffed Miller *close* to the end of Phase Two. Which is why we read their argument as straddling both phases (and which is why we split the discussion that follows into "Phase One Conduct" and "Phase Two Conduct"). Anyway, as framed this claim (centered on their doubts about legal doctrine) is a "purely legal" one over which "[w]e have jurisdiction" (despite what plaintiff believes) — though to the extent they also contest plaintiff's account of the facts along the way, we won't resolve them because we're powerless to do so. See, e.g., McKenney, 873 F.3d at 82. See generally In re Lac-Mégantic Train Derailment Litig., 999 F.3d 72, 77 (1st Cir. 2021) (remarking that "in the absence of jurisdiction, a federal court is 'powerless to act'" (quoting Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., 362 F.3d 136, 138 (1st Cir. 2004))).

*Phase One Conduct*

First up, the Phase One conduct — involving (as our chart in footnote 6 notes) Roycroft pressing Miller's chest to the ground with his right arm as Miller "push[ed] up," while his "left arm

[was] trapped underneath Miller." See Est. of Miller, 2024 WL 1416066, at *12.

## Roycroft

The rule "don't use excessive force!" is clearly established. See McKenney, 873 F.3d at 83 (citing Graham, for example). But that doesn't clue officers in on *what kinds of force* are excessive and *in which situations*. See id. Only when pre-existing precedent — "controlling" authority or a "consensus of persuasive" authority — involving "*similar*" facts puts the illegality of a specific action "beyond debate" may damages be awarded (points mentioned above). See Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 39 (1st Cir. 2024) (quoting Wesby, 583 U.S. at 63).[7] The legal rules that plaintiff relies on must've been so clearly established that reasonable officers would've known that they were doing wrong. See, e.g., Wesby, 583 U.S. at 63.

Plaintiff notes (as the judge did) that the officers acted *after* McCue held "that exerting significant, continued force on a person's back while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." See 838 F.3d at 64 (quotation marks omitted).

---

[7] No one argues that this is the rare obvious case where the violation is so clear that no similar case is needed. See id.; see also Wesby, 583 U.S. at 64. So we say no more about that subject.

- 19 -

And plaintiff adds (as the judge also did) that McCue's embrace of Abdullahi confirms that this rule applies where the plaintiff-pleasing version of the facts showed a person's "attempts to 'squirm' or arch his back upward while he was being restrained" wasn't "resistance" but instead was "a futile attempt to breathe." See Abdullahi, 423 F.3d at 769.

But unfortunately for plaintiff, we can distinguish both cases when it comes to the Phase One conduct (even without considering the officers' handcuffed-based argument here (we'll deal with that in the "Phase Two Conduct" section below)). Simply put, *no* officer in either case was *trapped* (or "immobilized," to use the officers' word) in the way Roycroft *was*. And while a plaintiff needn't cite a case "directly on point" to put the "constitutional question beyond debate," see Ashcroft, 563 U.S. at 741, McCue and Abdullahi are *too far* from "on point" to tip "every reasonable" officer off that the Phase One conduct would cross legal lines, see Wesby, 583 U.S. at 63; see also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (emphasizing that a right is "clearly established" when it's not among the "'hazy'" area of constitutional rules that officers at the scene might "reasonably misapprehend[e]d" (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001))).

## Jackson

Not much needs to be said about Jackson here. Because Roycroft's Phase One conduct didn't violate clearly established law, Jackson had no duty to intervene there. See, e.g., Davis, 264 F.3d at 114 (discussing when the duty to intervene arises).[8]

## Conclusion

We must reverse that part of the judge's order denying summary judgment on qualified-immunity grounds for the Phase One conduct.

### *Phase Two Conduct*

Next up, the Phase Two conduct — involving (as our chart in footnote 6 also notes) an officer "kneeling on" Miller's "back" after Roycroft had freed his arm. See Est. of Miller, 2024 WL 1416066, at *13.

## Roycroft

The officers argue that the judge stumbled in locating clearly established law in McCue. But their contentions don't work.

---

[8] Plaintiff insists that "Jackson never addressed the duty to intervene below" and so waived any objection he might've had to qualified immunity on that claim. But we fall back on the baseline rule that "[a]ppellate courts may . . . address an issue not presented to the lower court if the lower court nevertheless addressed the issue." Holsum de P.R., Inc. v. ITW Food Equip. Grp. LLC, 116 F.4th 59, 66 (1st Cir. 2024).

A few words about McCue.  Trying to take Phillip McCue into protective custody (he might've been high on bath salts), the McCue officers tased him, handcuffed him behind his back, laid him face down, and applied significant weight on his shoulders and neck for up to five minutes when he wasn't resisting.  838 F.3d at 56, 58, 62-64.  Which led to McCue's holding (after perusing relevant precedent) that pre-existing law clearly established "that exerting *significant, continued force* on a person's back while that [person] is in a face-down prone position after being *subdued* and/or incapacitated constitutes excessive force," see id. at 64 (quotation marks omitted and emphases added) — the italicized lingo play a starring role in the arguments that follow.

Anyhow, and importantly here, McCue found Abdullahi especially helpful in defining the contours of that clearly established law.  See McCue, 838 F.3d at 64.  The Abdullahi officers wrestled Jamal Mohamed (a PTSD sufferer) to the ground (after he had behaved menacingly).  423 F.3d at 764-65 (indicating that PTSD is short for "Post Traumatic Stress Disorder").  Mohamed then started "kicking his legs, moving his arms so they could not be handcuffed and arching his back upwards as if he were trying to escape."  Id. at 765.  And "for 30 to 45 seconds," one of the officers — as McCue noted, recapping Abdullahi — put "'his right knee and shin on the back of Mohamed's shoulder area and applied his weight to keep Mohamed from squirming or flailing.'"  McCue,

838 F.3d at 64 (quoting Abdullahi, 423 F.3d at 765). But despite Mohamed's thrashing around, Abdullahi — as McCue also documented — decided "that this movement may not have constituted resistance but rather 'a futile attempt to breathe' with the officer's weight on his upper body." Id. (quoting Abdullahi, 423 F.3d at 771). Which explains Abdullahi's ultimate holding that the summary-judgment record showed a violation of Mohamed's constitutional rights (even though a trial might present a different record). Abdullahi, 423 F.3d at 769-70.

As previewed above, plaintiff's judge relied on McCue and McCue's embrace of Abdullahi in ruling that clearly established law recognized plaintiff's "constitutional right to be free from an officer kneeling on his back after he had been restrained" — something "a reasonable officer would have been aware" of. See Est. of Miller, 2024 WL 1416066, at *13. See generally Hope v. Pelzer, 536 U.S. 730, 738-44 (2002) (indicating that an action's unlawfulness can be apparent not only from direct holdings but also from specific examples deemed unlawful). The officers argue against that ruling. But their theories — one law-based, the others fact-based — provide no foothold for a reversal.

(i)

The officers' legal argument is that McCue's lesson — "that exerting significant, continued force on a person's back while that [person] is in a face-down prone position *after being*

- 23 -

*subdued* and/or incapacitated constitutes excessive force" (emphases added) — applies only to force used on an *already-handcuffed* person. And they think this because McCue was already cuffed when the officer used his knee as he did. So to them, "subdued" or "restrained" means — as a legal matter — "handcuffed." Accordingly, they go on, because "no knee or pressure of any kind was placed on Miller's back at any point *after* the handcuffs were applied," plaintiff's case falls outside McCue's ambit — meaning McCue can't provide the clearly established law needed to overcome qualified immunity for the Phase Two conduct.

That's legally wrong. Abdullahi — flagged by McCue as a textbook example of unconstitutional conduct — shows as much because an officer there (like one here) inflicted the illegal force *before* the person was cuffed. See Abdullahi, 423 F.3d at 765 (recounting that the officer "took his weight off Mohamed *after* the handcuffing was complete" (emphasis added)). And — to spell out the obvious — McCue's reliance on Abdullahi in pinpointing the clearly established rule makes plain that the directive extends to persons *not* already cuffed, despite what the officers claim. See generally Taylor v. City of Milford, 10 F.4th 800, 804, 808 (7th Cir. 2021) (disclosing that the summary-judgment record supported a violation of clearly established law where an officer used "his weight" to keep an *uncuffed* person "experiencing a diabetic emergency" face down on a bed (citing McCue, among other

- 24 -

authority)). So the argument as framed by them has no oomph. See generally United States v. Sineneng-Smith, 590 U.S. 371, 375 (2020) (commenting that the party-presentation principle compels courts to "rely on the parties to frame the issues for decision" (quoting Greenlaw v. United States, 554 U.S. 237, 243 (2008))). Critically, too, if the officers think they've made any other "Miller wasn't subdued"-type legal arguments (the quoted phrase is our shorthand descriptor), we'd find them "too 'skeletal' or 'confusingly constructed'" to be preserved. See Págan-Lisboa v. Soc. Sec. Admin., 996 F.3d 1, 7 (1st Cir. 2021) (quoting Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011)).

(ii)

The officers next make a series of fact-based contentions — pitting their story against plaintiff's (the evidence doesn't undeniably establish a single account). But unfortunately for them, we have no jurisdiction to decide whether they get qualified immunity under a different version of the facts (as this part of our opinion drives home). See, e.g., Johnson, 515 U.S. at 317.

Zeroing in on McCue's "continued force" requirement, the officers argue that the judge "incorrectly *held* that placing a knee on the back of an individual '*for a few seconds*' (at most) in order to facilitate handcuffing is, *per se*, an excessive use of force — and that an objectively reasonable officer in Roycroft's

and Jackson's position would have known doing so violated Miller's constitutional rights" (emphases added).  The officers create that "h[o]ld[ing]" out of thin air.  True, the judge did say that Roycroft claimed that the kneeling force (if used) could've lasted for only a "few seconds."  Est. of Miller, 2024 WL 1416066, at *14 n.2.  But the judge explicitly found a fact "dispute" over "how long" Roycroft (or Jackson) applied pressure.  Id. at *14.  So their claim as presented can't move the needle in their favor.  See, e.g., Sineneng-Smith, 590 U.S. at 375-80 (discussing the party-presentation rule so basic to "our adversarial system").  And if the officers believe they've raised any other "no continuous force"-type claims (our shorthand descriptor for this facet of their argument), they waived them through inadequate briefing.  See, e.g., Págan-Lisboa, 996 F.3d at 7.

Now looking to distance themselves from Abdullahi, the officers say that an officer there "continued to apply force after the [person] *stopped resisting*" (emphases added).  But they can't duck the judge's express rulings that "a jury could find that an objectively reasonable officer with [their] training would have concluded that Miller was *struggling to breathe, not resisting*" as Roycroft (or Jackson) applied pressure.  See Est. of Miller, 2024 WL 1416066, at *11-12 (emphases added).[9]  The officers mention in

---

[9] Faced with Anderson's account that Miller said "I can't breathe" and "Amy, help me," the officers basically challenge her

- 26 -

passing that they "could have reasonably (even [if] mistakenly)" thought Miller "[w]as offering resistance."  But by making the suggestion without any developed rationale, they waived it.  See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).[10]

The officers then write that they didn't defy clearly established law because they "knew Anderson was in a dangerous situation due to Miller's behavior prior to the 911 call."  The judge did say that a sound jury *could* infer that Miller posed a danger to Anderson.  See Est. of Miller, 2024 WL 1416066, at *10.  But the judge also said that an astute jury *could* alternatively

credibility — contending that her memory was "unclear" at times.  But at summary judgment, credibility calls go to the plaintiff (and credibility is a matter for the jury, *not* us).  See, e.g., Rodríguez, 659 F.3d at 180.  Relying on Hunt v. Massi, the officers also note that "a police officer *need not* credit everything" a resisting criminal suspect "tells him."  773 F.3d 361, 369 n.6 (1st Cir. 2014) (emphasis added) (quoting Rodriguez v. Ferrell, 294 F.3d 1276, 1278 (11th Cir. 2002)).  But see Jennings v. Jones, 499 F.3d 2, 16 (1st Cir. 2007) (holding that clearly established law banned officers from "increas[ing] their use of physical force after an arrestee who has been resisting arrest stops resisting for several seconds and warns them that they are" exacerbating his injuries).  But the officers are stuck with the judge's finding (so important we've quoted it more than once) that "a jury *could* find that an objectively reasonable officer with [their] training would have concluded that Miller was struggling to breathe, *not resisting*."  See Est. of Miller, 2024 WL 1416066, at *11 (emphases added).  We say "stuck" because their attempt to upset how the judge understood this part of the record is verboten.  See, e.g., Brown, 117 F.4th at 6.

[10] The "not resisting" piece of the judge's ruling also distinguishes this case from others they cite — like Gray v. Cummings — where the person "resist[ed] arrest."  917 F.3d 1, 12 (1st Cir. 2019).

draw the reasonable inference that Miller "*did not* appear to be posing a danger to *anyone*." See id. (emphases added). And then the judge did what she's supposed to do by adopting the competing inferences in *plaintiff's favor*. See id.; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). So this fact quarrel (like the others) "exceeds the jurisdictional limit." See Brown, 117 F.3d at 6.

Somewhat relatedly, the officers protest that Roycroft's "low-level, empty-hand force" on Miller didn't offend clearly established law because Miller could've used a golf club or some object in his hand as a weapon. But the judge didn't call the force "low-level" — probably because the evidence indicates that once Roycroft freed his arm, he (assuming it was he, not Jackson) applied his full weight through his knee with enough force to cut-off Miller's air. The judge also said that a right-thinking jury could find it "improbabl[e] or impossible" that Miller could wield a golf club from his stomach. See Est. of Miller, 2024 WL 1416066, at *11. Plus the judge saw "no objective evidence" that Miller had any other "object in his hand." See id. And the judge found as well that a clear-eyed jury could conclude that Miller wasn't trying to hurt "anyone." See id. at *5, 11 (underscoring that Miller "never threatened" the officers (or Anderson) and didn't "punch, kick, or otherwise strike" them, and adding that while Miller did "flail[] his legs" "[d]uring the altercation," the

- 28 -

evidence "supports the inference" that he was simply trying to breathe).[11]  Because the officers' argument simply boils down to a beef about plaintiff's side of the facts, we can't consider it. See Brown, 117 F.4th at 6.[12]

## Jackson

The officers finally argue that Jackson had no clearly established duty to intervene, arguing (for instance) that "[w]hile [plaintiff's use-of-force expert] might criticize Jackson for not having been able to handcuff Miller faster, there is no indication Jackson delayed his efforts or somehow delayed Miller's handcuffing."  But they face an insuperable hurdle.  After listing the components of a failure-to-intervene claim spotlighted in Davis — i.e., a plaintiff must show that the officer (i) "'was

---

[11] The judge's Miller-wasn't-a-threat finding — made after looking at the record in a plaintiff-friendly way (as her other findings were) — differentiates this case from Justiniano v. Walker, a case the officers' cite that involved a person who did "pose[] a threat" from the viewpoint of a reasonable officer.  986 F.3d 11, 28 (1st Cir. 2021).

[12] Don't misunderstand us.  We know that officers on the scene must often make "split-second" decisions to act (or not) in situations where their choices (sometimes made with insufficient info) could prove fatal to them and others (that's worlds apart from what we judges do, reviewing excessive-force claims from the confines of our chambers — protected by federal marshals and blessed with time to reflect).  See Graham, 490 U.S. at 396-97. But they must accept plaintiff's report of what happened (the trial may cast the facts in a different light, of course).  See Brown, 117 F.4th at 6.  And they can't — as they try to do at different junctures — question the judge's decision that "the pretrial record sets forth a 'genuine' issue of fact for trial."  See Johnson, 515 U.S. at 320.

- 29 -

present when excessive force was used'"; (ii) "'observed the use of excessive force'"; (iii) "'was in a position where he . . . could realistically prevent that force'"; and (iv) "'had sufficient time to do so'" — the judge found "factual disputes regarding events immediately after" Jackson's punches "that the jury must decide," see Est. of Miller, 2024 WL 1416066, at *13-14 (quoting Davis, 264 F.3d at 102), including: "whether one of the officers put his knee on [Miller's] back and if so, for how long and how much pressure was exerted," id. at *14. The officers' opening brief does use Davis-like buzzwords in laying out the legal requisites of that kind of claim. But they don't engage there with the facts and analysis that the *judge* relied on, resulting in waiver — a problem their reply brief can't cure, either. See, e.g., Vizcarrondo-González v. Vilsack, No. 20-2157, 2024 WL 3221162, at *7 (1st Cir. June 28, 2024) (citing caselaw holding that a party commits waiver by "fail[ing] to address in its opening brief a basis on which the district court ruled against that party"); United States v. López, 957 F.3d 302, 309 (1st Cir. 2020) (declaring it "settled beyond hope of contradiction that arguments not made in an appellant[s'] opening brief are deemed abandoned").

## Conclusion

We must affirm that part of the judge's order denying summary judgment on qualified-immunity grounds for the Phase Two conduct.

- 30 -

**FINAL WORDS**

Having intently studied the officers' arguments against the judge's summary-judgment order denying their request for qualified immunity, we ***reverse*** the denial in part (regarding the Phase One conduct), ***affirm*** the denial in part (regarding the Phase Two conduct), ***dismiss*** the appeal in part (regarding the fact-based arguments inappropriate for interlocutory appeal), ***remand*** for further proceedings consistent with this opinion, and ***award no*** appellate costs.[13]

---

[13] This seems like a perfect spot to note that — in addition to alleging a federal excessive-force claim — plaintiff also alleged a state wrongful-death claim. Apparently proceeding on the idea that the wrongful-death claim depended on the success of the excessive-force claim, the judge wrote that because "there are disputed material factual issues whether Roycroft and Jackson used excessive force," she was denying the officers' motion for summary judgment on the wrongful-death claim as well. Est. of Miller, 2024 WL 1416066, at *15. No one has briefed what effect a reversal on the excessive-force claim (even in part) would have on the wrongful-death claim. The parties and the judge can sort that out on remand.